18 F.3d 986
 NATIONAL WEATHER SERVICE EMPLOYEES ORGANIZATION, BRANCH
1-18, and National Weather Service Employees
Organization, Branch 1-11, Plaintiffs-Appellants,
National Weather Service Employees Organization, Branch
4-36, Plaintiff,
v.
Ronald H. BROWN, Secretary, United States Department of
Commerce, Defendant-Appellee.
 No. 2046, Docket 93-6138.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 12, 1993.
Decided Feb. 25, 1994.
 
 Richard J. Hirn, Washington, DC, (Sidney H. Kalban, Phillips, Cappillo, Kalban, Hoffman & Katz, P.C., New York City), for plaintiffs-appellants.
 Scott R. McIntosh, Washington, DC, (Frank W. Hunger, Asst. Atty. Gen., Roger S. Hayes, U.S. Atty., Barbara L. Herwig, Douglas N. Letter), for defendant-appellee.
 Before: WINTER, MINER, and WALKER, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 Plaintiffs-appellants, two local branches of the National Weather Service Employees Organization ("the Unions"), appeal a ruling of the district court (John S. Martin, Jr., Judge ), granting summary judgment for defendant Ronald H. Brown, Secretary of the United States Department of Commerce, who oversees the National Weather Service ("NWS"). The Unions argue that the NWS violated the Weather Service Modernization Act of 1992, Pub.L. No. 102-567, 106 Stat. 4303 (codified at 15 U.S.C. Sec. 313 note) ("WSMA" or "Modernization Act" or "Act"), when it scheduled the transfer of weather forecasting services from urban locations in Boston and New York to locations outside of those cities without the formal certification they claim is required under the Modernization Act. The district court ruled that the NWS had not violated the statute because formal certification was not required for these moves. We affirm the judgment of the district court.
 
 BACKGROUND
 
 2
 The appeal stems from the ongoing effort to modernize the collection and analysis of weather forecasting data by the NWS. As part of this NWS modernization program, the NWS set in motion a plan to incorporate into its operations the diverse technological advances in the field of meteorological science made since the 1950's and 1960's, when most of the currently used technical equipment was built and installed. Included in these new technologies is "Next Generation Radar" ("NEXRAD"), a radar system vastly more accurate than conventional radar in predicting weather disturbances.
 
 
 3
 To further the modernization, the NWS began a process of restructuring its field offices. Although the NWS presently operates approximately 50 large Weather Service Forecast Offices ("WSFOs") and some 200 smaller Weather Service Offices ("WSOs"), the completion of the Modernization Program will leave 120 Weather Forecast Offices ("WFOs"), each with uniform responsibilities and tied to the closest NEXRAD unit.
 
 
 4
 The transition between the WSFOs and WSOs to the new WFOs involves a complex set of procedures. After a new WFO is constructed, the NWS transfers certain warning and forecast responsibilities and associated personnel to the new site, in anticipation of the installation of the NEXRAD unit. The warning and forecast personnel, who typically perform their duties sitting in front of a computer terminal, continue as before to receive data from numerous locations and issue their forecasts and warnings. Meanwhile, back at the old WFSO or WSO, responsibilities for observational services including radar and surface surveillance remain unchanged, and associated personnel continue to perform these observations at the old site, now classified as a "residual Weather Service Office."
 
 
 5
 Once the NEXRAD unit is installed at the new WFO, tested, and eventually commissioned by the NWS, radar responsibilities are switched to the NEXRAD system, although the old radar system continues in operation. In anticipation of final closure or automation of the old office, the NWS as required by the Act prepares appropriate reports reviewing the decommission of the old radar and the automation of observational services, and certifies, after issuing a report that is open to notice and comment, that no degradation of service will occur as a result of the modernization. Finally, the old offices are either closed or fully automated. At dispute in this case is the precise point in this modernization process at which the NWS must certify that no degradation of service will occur.
 
 
 6
 Pursuant to these procedures, the NWS instituted plans to transfer the warning and forecast responsibilities and associated personnel 81 miles within New York State, from New York City to Brookhaven, Long Island, and in Massachusetts from Boston to Taunton, a distance of 47 miles. The Unions brought an action in the district court to enjoin the transfers. The Unions argued that the transfers would "relocate" NWS operations outside the "local commuting area," thereby triggering the Act's provision requiring the NWS to certify that no "degradation of service" will result.
 
 
 7
 The district court granted summary judgment in favor of the NWS. It ruled that the NWS's interpretation of the phrase "local commuting area" based upon the Office of Management and Budget's definition of Metropolitan Area was reasonable and entitled to deference under the rule of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). It did not reach the NWS's alternative argument that each transfer was not a "relocation" but rather a "change in service at a field office," which does not require formal certification.
 
 
 8
 The Unions appealed and sought a stay of the transfers pending the outcome. Another panel of this court initially issued a stay, but this panel lifted the stay shortly after oral argument. We note that a related appeal involving the Los Angeles field office is pending. In that case, the district court reached the NWS's alternative argument because the move was conceded to be outside the local commuting area and held that the NWS's classification of the move as a transfer of service responsibilities and not a relocation was a reasonable interpretation of the Act. See National Weather Serv. Employees Org., Branch 4-36 v. Brown, No. 93 Civ. 4677 (JSM), 1993 WL 336994, at * 1-2, 1993 U.S. Dist. LEXIS 12014, at * 3-4 (S.D.N.Y. Aug. 27, 1993).
 
 DISCUSSION
 I. Standing
 
 9
 Before the district court, the NWS challenged the Unions' standing to bring this action. The district court declined to decide the issue because it had dismissed the Unions' action on summary judgment. The district court should not have proceeded without first addressing the standing issue because standing is a jurisdictional prerequisite based upon the "case and controversy" requirement of Article III. Absent standing, courts "lack power to entertain the proceeding." 13 Wright, Miller & Cooper, Federal Practice & Procedure, Sec. 3531, at 345 (2d ed. 1984); see also National Org. for Women, Inc. v. Scheidler, --- U.S. ----, ----, 114 S.Ct. 798, 802, 127 L.Ed.2d 99 (1994) ("Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.").
 
 
 10
 The doctrine of standing is composed of constitutional and prudential components. Constitutionally, a party must demonstrate that the challenged action leads to (1) injury-in-fact (2) fairly traceable to that challenged action and that (3) the injury is judicially redressable. See United States v. Grundhoefer, 916 F.2d 788, 791 (2d Cir.1990) (citing Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 151-52, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450 (1976); and Linda R.S. v. Richard D., 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973)). In this case, plaintiffs have established that the scheduled moves will cause direct injury to at least some of their constituent workers who would be forced to relocate or undergo long commutes. If it turns out that certification would have been denied because service will be degraded, NWS employees will have unnecessarily suffered this harm by being forced to relocate now. Thus, the plaintiffs meet the constitutional standing requirement.
 
 
 11
 When associations bring suit on behalf of its members, as the Unions do in this case, certain additional standing requirements must be met. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); see also Rent Stabilization Ass'n v. Dinkins, 5 F.3d 591, 596 (2d Cir.1993). Plaintiffs satisfy these requirements. As stated above, the workers would have individual standing, and the Unions, whose primary goal is the representation and protection of their members against decisions of their employer adverse to their interests, can seek to enjoin the NWS's scheduled moves without the participation of any constituent members in the suit.
 
 
 12
 Prudentially, the interest of the plaintiffs must be " 'within the zone of interests' protected by the federal law invoked." Grundhoefer, 916 F.2d at 792 (citing Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) and Data Processing, 397 U.S. at 153, 90 S.Ct. at 830). As the Supreme Court has stated, the zone-of-interests test is not a rigorous one, and a right of review will be denied only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding...." Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). The Modernization Act was enacted with union and worker interests at least partly in mind. It specifically provides that members of the Modernization Transition Committee established under the Act are to come from various interested groups, including "any labor organization certified by the Federal Labor Relations Authority as an exclusive representative of weather service employees." WSMA Sec. 707(b)(1)(B). In this case, the plaintiff Unions meet this requirement. We thus conclude that plaintiffs have standing to bring this suit.
 
 II. Requirements under the Modernization Act
 
 13
 The Unions assert that the Modernization Act, which represents Congress's efforts to facilitate the orderly modernization of the National Weather Service, requires a formal certification by the NWS of no degradation of service before the NWS can transfer the warning and forecasting operations as planned. The NWS maintains that under the Act, no certification is required for these transfers.
 
 
 14
 We begin with the language of the Act. Section 706 of the Act, entitled "Restructuring Field Offices," states in part:
 
 
 15
 (b) Certification.--The Secretary shall not close, consolidate, automate, or relocate any field office, unless the Secretary has certified that such action will not result in any degradation of service[.]
 
 
 16
 WSMA Sec. 706(b). The Unions claim that the NWS's planned moves constitute a field office "relocation" under Sec. 706(b). The Act defines a relocation as a "transfer from one location to another location that is outside the local commuting or service area." WSMA Sec. 702(7). There is no dispute that both challenged moves are within the same "service area"; however, the parties sharply disagree over whether the transfers are beyond the "local commuting area." The Act does not define "local commuting area."
 
 
 17
 The NWS offers two responses. First, it claims that each contemplated transfer is not a field office "relocation" at all, but is only a "change in operations at a field office." While the Act does require that Congress be notified of any such change, see WSMA Secs. 703(a)(2), 705(a), no certification regarding non-degradation of service is required. The Act provides that to "change operations at a field office" means to:
 
 
 18
 transfer service responsibility, commission weather observation systems, decommission a National Weather Service radar, change staffing levels significantly, or move a field office to a new location inside the local commuting and service area....
 
 
 19
 WSMA Sec. 702(2). The NWS submits that the planned transfers at issue in this case merely transfer service responsibility because the NWS is maintaining both the new and the old offices and only transferring discrete service responsibilities regarding forecasting and warning to the new sites. The NWS concedes that the "residual" offices in New York and Boston will be subject to the certification requirement when they are consolidated with the new offices or when their observational functions are automated, but reiterates that such certification is not necessary at the current stage of the transition.
 
 
 20
 Alternatively, the NWS argues that neither of the planned transfers are outside the "local commuting area." As that term is not defined in the Act, the NWS argues that its interpretation, which is derived from the Office of Management and Budget's definition of Metropolitan Area, is reasonable and entitled to deference. See Chevron, 467 U.S. at 843, 104 S.Ct. at 2782.
 
 
 21
 We agree with the NWS that the transfers in this case were properly considered transfers of service responsibility and not office relocations. Accordingly, we do not reach the issue whether Brookhaven and Taunton are properly considered within the local commuting area of New York and Boston, respectively.
 
 
 22
 The NWS construes the planned transfers in this case to be changes in operations at a field office. In reviewing this interpretation of the Modernization Act, our inquiry is guided by the principles of agency review established in Chevron.
 
 
 23
 Our first task is to decide whether Congress has spoken to the disputed issue directly, for if so, that ends our inquiry:
 
 
 24
 First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.
 
 
 25
 See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. The NWS asserts that the statute is unambiguous because the moves contemplated are plainly "transfers of service responsibilities," for which the statute explicitly requires only notification, not certification. However, we are hesitant to find the language of the Act unambiguous. The Act does not define the phrases "transfer of service responsibility" or "local commuting area," nor does it set forth the relationship between the two. Reading these two provisions together, it is not clear whether the moves in this case can be considered transfers of service responsibility, or whether they must be considered "relocations" if outside the local commuting area. Therefore, we believe the Modernization Act is ambiguous as to the exact stage when certification becomes necessary.
 
 
 26
 Under Chevron, when a statute is silent or ambiguous on a disputed issue, and the agency provides an interpretation to fill the interstices, the court's only remaining inquiry is to decide if the agency's interpretation of the statute is a permissible one:
 
 
 27
 If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 28
 See Chevron, 467 U.S. at 843, 104 S.Ct. at 2782 (footnote omitted). We believe that the NWS's classification of the planned moves as merely transfers of service responsibility is a permissible construction of the Act, and thus under Chevron, we defer to this interpretation.
 
 
 29
 The transfer of the warning and forecasting responsibilities and personnel constitutes the archetypical "transfer of service responsibilities." The urban field offices remain in service, and the data collection and observational duties there continue unchanged. The only change is that the warning and forecasting personnel will perform their duties in front of a computer in Brookhaven or Taunton rather than in New York or Boston.
 
 
 30
 Moreover, the express language of Sec. 706(b) states that the certification requirement is triggered only upon relocation of "any field office." In this case, because the urban field offices remain in operation, they are not physically being relocated at this point. Rather, the NWS is creating a new office, while maintaining the existing office. Some service responsibilities are being transferred to the new office while others are being kept at the existing office. It seems to us that a contrary holding would strip the term "transfer of service responsibility" of any meaning, and the law disfavors a statutory construction that would render part of a statute a nullity. See, e.g., Trichilo v. Secretary of Health & Human Servs., 823 F.2d 702, 706 (2d Cir.1987).
 
 
 31
 The Unions argue that we should not defer to the NWS's interpretation of the Modernization Act since it contravenes the Congressional intent underlying the Act; namely, to cabin the discretion of the NWS in its modernization program so as to reduce the impact on NWS employees. Even if we were to accept that Congress wanted to place restrictions on the NWS, nothing in Sec. 706(b) or its legislative history indicates that the certification process was designed to protect the interests of NWS employees. While no doubt the Act contemplates employee input into the certification process, see WSMA Sec. 707(b)(1)(B) and (c)(1), the certification provision is singularly a public safety provision, not a worker protection provision. Its clear purpose is to ensure that the modernization program does not result in any "degradation of service." See S.Rep. No. 198, 102d Cong., 1st Sess. 7-8 (1991).
 
 
 32
 Viewed in this light, it is evident that the transfers in question should not require certification because the only field office functions dependent upon the office's location, weather inputs, are not being moved. The transfers are confined to office functions that logically should not result in a degradation of service to the public. All of the employees are doing exactly the same jobs with exactly the same inputs, except the warning and forecasting personnel are doing their jobs in a different location.
 
 
 33
 The Unions' effort to co-opt the certification provision as a shield for worker protection fails for another reason. It would be anomalous indeed if the NWS could eliminate a significant number of its employees, that is "change staffing levels significantly" under Sec. 702(2), with only "notification" to Congress, yet could not transfer some positions, with no reduction in workforce, without formal certification. We see no basis for concluding that Congress intended to suffocate the NWS's modernization strategy by needlessly requiring a formal and lengthy certification process when there is no potential for a degradation of service. See S.Rep. No. 198, 102d Cong., 1st Sess. 4 (1991) (recognizing "the importance of maintaining the NWS modernization schedule").
 
 
 34
 Finally, the Unions argue that even if only notification, and not certification, is required, the NWS failed to follow the notification procedures of Sec. 703 of the Modernization Act. We reject this argument because the plain language of the Act makes clear that such notification is not required for modernization steps taken before fiscal year 1994. See WSMA Sec. 703(a) (stating that notification is required "for each fiscal year following fiscal year 1993 until such modernization is complete").
 
 CONCLUSION
 
 35
 We hold that the transfers in these cases do not trigger the certification requirement of Sec. 706(b) of the Weather Service Modernization Act of 1992, and thus we affirm the judgment of the district court.