**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**December 8, 2004**

**Charles R. Fulbruge III**
**Clerk**

REVISED JANUARY 7, 2005

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-40028

DONALD M. ADKINS,

Plaintiff-Appellant,

versus

DON KASPAR, Chaplaincy Department; ROY A. GARCIA, Warden, Coffield Unit; MICHAEL W. SIZEMORE, Assistant Warden, Coffield Unit; KENNETH M. REYNOLDS, Chaplain, Coffield Unit; LARRY HART, Assistant Chaplain, Coffield Unit; KEVIN MOORE, Senior Warden, Coffield Unit; LEONARD SANCHEZ, Senior Chaplain, Coffield Unit,

Defendants-Appellees,

Appeal from the United States District Court
for the Eastern District of Texas

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Donald M. Adkins, a Texas state prisoner incarcerated at all relevant times in the Coffield Unit ("Coffield") and proceeding pro se, filed suit in district court alleging violation of his First and Fourteenth amendment rights, as well as violation of the Religious Land Use and Institutionalized

Persons Act ("RLUIPA").[1]  Made defendants were Don Kaspar of the Chaplaincy Department of the Texas Department of Criminal Justice ("TDCJ") and the following Coffield personnel:  Roy A. Garcia, Michael Sizemore, Kenneth Reynolds, Larry Hart, Kevin Moore, and Leonard Sanchez (collectively, "defendants").  Following a Flowers[2] hearing, the magistrate judge made findings of fact and conclusions of law, and recommended dismissing Adkins's action with prejudice. The district court adopted the magistrate judge's recommendation and dismissed the suit.  Adkins advances four claims on appeal: (1) The district court erred in concluding that there was no violation of his First Amendment right to free exercise of his religion; (2) the district court erred in concluding that he suffered no Equal Protection violation; (3) defendants' actions violated the RLUIPA's prohibition of substantially burdening religious exercise without specifying a compelling governmental interest and a narrowly tailored solution; and (4) the magistrate judge's denial of Adkins's witness subpoena requests was an abuse of discretion.  We affirm.

## I.  FACTS AND PROCEEDINGS

Adkins is a member of the Yahweh Evangelical Assembly ("YEA"). The gravamen of his complaint is that he has not been permitted to

---

[1] 42 U.S.C. § 2000cc et seq.

[2] Flowers v. Phelps, 956 F.2d 488 (5th Cir.), vacated and superceded in part on denial of reh'g, 964 F.2d 400 (5th Cir. 1992).

observe particular days of rest and worship (each Saturday for the Sabbath and a number of specific holy days), which is a requirement of his faith. The case was referred to a magistrate judge, who conducted an evidentiary hearing consistent with <u>Flowers</u>. Adkins's witnesses at the <u>Flowers</u> hearing included (1) Jerry Healan, a YEA elder who went to Coffield once a month to preside over observance of the Sabbath, (2) David and Nancy McEnany, who work with YEA inmates in the Oklahoma prison system and trained to be YEA volunteers at Coffield, and (3) Adkins himself.[3] Defendant Sanchez, the Senior Chaplain at Coffield, was the only witness for the defendants.

Healan testified that the YEA requires its adherents to meet together on every Sabbath and to congregate and make particular observations on specific holy days. He further testified that he has been permitted to go to Coffield and hold a baptismal service for Adkins and other inmates, and that, following volunteer training, he has gone to Coffield once a month to oversee Sabbath observances. Healan estimated that approximately 25 to 30 Coffield inmates regularly attend these meetings. Healan stated that he is unable to attend more often because of the distance he must travel to and from Coffield, and the travel time's effect on his other religious and personal obligations. Healan also testified that he

---

[3] Adkins also called Thomas Hobbs as a witness. As his testimony is irrelevant to any issue in this case, we have not included it in this recitation of facts.

and Adkins correspond regularly and that he sends religious materials to Adkins in prison. Healan stated that Adkins has a solid understanding of YEA beliefs, and has authored several articles that were published in newsletters and on the Internet.

The McEnanys testified that they went through the Coffield religious volunteer program so that they could attend and oversee Sabbaths at Coffield. At the time of the Flowers hearing, however, neither of them had been cleared by prison officials to lead meetings on their own.

Adkins acknowledged he has been granted "lay-ins" for holy days and the Sabbath, but testified that he and other YEA members had been denied the right to assemble and hold services on their own. He also acknowledged that he and other YEA members had been allowed to attend tape sessions and listen to tapes sent by Healan, but that they are only allowed to do this on Mondays. Adkins averred that he was told that the tape sessions cannot be held on Saturdays unless an accredited religious volunteer is present.

Sanchez testified in response that YEA members are allowed to congregate on the Sabbath when Healan is present at Coffield, and that if Healan were able to attend more frequently on Sabbaths and holy days, arrangements would be made for the YEA members to congregate, conditioned only on availability of space and time. Sanchez confirmed that thus far the McEnanys had not been allowed to lead YEA services at Coffield without the supervision of Healan because of a concern that "some things that were going on" were

4

"inmate driven." Sanchez added, however, that if the McEnanys would attend several more sessions with Healan, they would be accredited to lead YEA services on their own. Sanchez also testified that there are some 3200 inmates at Coffield and approximately 150 recognized faith groups in the prison system.

The magistrate judge concluded that the defendants had not denied Adkins a reasonable opportunity to exercise his religion. Applying the definition of "substantial burden" enunciated by the Seventh Circuit in Mack v. O'Leary,[4] the magistrate judge concluded that the defendants had not burdened Adkins's religious exercise in violation of the RLUIPA. The magistrate judge recommended dismissal of Adkins's action; and, after considering the record, the magistrate judge's recommendations, and the objections raised by Adkins, the district court dismissed the case.

## II.  ANALYSIS

A.  STANDARD OF REVIEW

An evidentiary hearing consistent with Flowers v. Phelps[5] "amounts to a bench trial replete with credibility determinations

---

[4] 80 F.3d 1175 (7th Cir. 1996).

[5] 956 F.2d 488 (5th Cir.), vacated and superseded in part on denial of reh'g, 964 F.2d 400 (5th Cir. 1992).

and findings of fact."[6]  A district court's legal conclusions at a bench trial are reviewed de novo and its findings of fact are reviewed for clear error.[7]

## B.    FREE EXERCISE CLAIM

Adkins's original complaint alleged that defendants non-compliance with the TDCJ's religious accommodation policy impinged on the free exercise of his faith.  Citing Turner v. Safley,[8] Adkins argues on appeal that defendants' violations of the TDCJ policy are not the basis of his First Amendment claim, just evidence to be considered in evaluating it.  Our review of the district court's factual findings regarding defendants' compliance with the TDCJ policy reveals no clear error.  Adkins's only viable free exercise claim lies in his challenge to the constitutionality of the TDCJ policy.

Turner established a four-factor "rational relationship" test for analyzing the constitutionality of regulations that burden a prisoner's fundamental rights.[9]  Under Turner's test, courts must consider (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether there exist "alternative means

---

[6] McAfee v. Martin, 63 F.3d 436, 437 (5th Cir.1995).

[7] Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship, 342 F.3d 416, 418 (5th Cir. 2003).

[8] 482 U.S. 78 (1987).

[9] Id.

of exercising the fundamental right that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there is an "absence of ready alternatives" to the regulation in question.[10]

We recently upheld the constitutionality of the TDCJ's religious accommodation policy in Freeman v. Texas Department of Criminal Justice.[11] In that case inmates filed a class action suit alleging that the TDCJ failed to provide them adequate opportunity to practice their faith, in violation of the First and Fourteenth Amendments. Applying Turner, we affirmed the district court's grant of those defendants' motion for summary judgment to dismiss the inmates' case. Like the inmates in Freeman, Adkins seeks a permanent injunction requiring the TDCJ to make provisions for additional YEA services.

In Freeman, we held that the TDCJ's religious accommodation policy is rationally related to legitimate government objectives, the first and "paramount inquiry under Turner."[12] Addressing the second prong of the Turner test — whether "alternative means" of

_____

[10] Id. at 89-90.

[11] 369 F.3d 854 (5th Cir. 2004).

[12] Id. at 861. Specifically, that staff and space limitations, as well as financial burdens, are valid penological interests. Id. (citing Ganther v. Ingle, 75 F.3d 207, 211 (5th Cir. 1996).

exercising the group's religious beliefs exist —— Adkins argues, and the record reflects, that he and the other YEA members were not permitted to assemble on every Sabbath day and on particular holy days because no volunteer deemed acceptable by defendants was available to supervise the meetings. In analyzing the availability to inmates of "alternative means" of exercising their religion, however, "[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith."[13] The magistrate judge found, and the record confirms, that (1) Adkins had access to religious materials; (2) he and other YEA inmates were not required to work on the Sabbath; (3) video and audio tapes were made available on Mondays to all YEA members; and (4) YEA members were permitted to hold and attend live services when Healan was able to attend. These supplemental services, materials and other accommodations furnish Adkins and the YEA members with "alternative means" of exercising their religion.[14]

Adkins contends that the tape sessions were no longer allowed following the filing of this suit. Contrary to this, though, the magistrate judge's findings, which the district court adopted,

_____

[13] Id.

[14] See O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987) (upholding a regulation that prohibited Muslim prisoners from attending Friday afternoon services, the Court found the ability to participate in other Muslim religious ceremonies satisfied Turner's "alternative means" test).

state that the tapes are still made available for viewing. The current status of the tape sessions is not absolutely clear from the record, but on appeal we look for clear error only, and we find none here. In addition, Sanchez stated at the Flowers hearing that if Healan comes to the prison more frequently, additional Sabbath meetings will be accommodated.

We do find some source for concern in the prison's rejection of the McEnanys as volunteers. According to affidavits filed in the district court, the McEnanys were certified by the official volunteer training program and are currently allowed to conduct Sabbath meetings in the Oklahoma prison system. Although Sanchez, in his testimony at the hearing, expressed concern that some occurrences involving the McEnanys were "inmate driven," he did indicate that if the McEnanys attend several sessions at which Healan is present so that they "can get their feet on the ground," they will be allowed to conduct YEA services on their own.

Third, we must consider the impact of granting Adkins injunctive relief on "guards and other inmates, and on the allocation of prison resources generally." The 20 to 25 active members of YEA constitute less than one percent of the large inmate population at Coffield. Requiring the defendants to accommodate every religious holiday and requirement of the YEA, regardless of the availability of volunteers, space, or time, could "spawn a cottage industry of litigation and could have a negative impact on

prison staff, inmates and prison resources."[15]  Moreover, if Adkins were accommodated and other similarly situated small religious groups were not, the YEA could appear to be favored over the others, a perception that could have a negative effect on prison morale and discipline.[16]

Finally, "no obvious, easy alternatives would accommodate both" Adkins and the TDCJ's administrative needs.[17]  Adkins's request that defendants allow the YEA members to assemble on each of their holy days and every Sabbath, regardless of the availability of qualified volunteers and adequate space and security, is not an "alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests."[18]  Chaplain Sanchez testified that the YEA would be allowed to meet on every Sabbath that Healan or another qualified volunteer is present, as well as on YEA holy days, if space and time are available.  In light of the foregoing facts and considerations, we affirm the district court's dismissal of Adkins's First Amendment free-exercise claim.

---

[15] Freeman, 369 F.3d at 862; see also Turner, 482 U.S. at 90 ("When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.").

[16] See Kahey v. Jones, 836 F.2d 948, 951 (5th Cir. 1988).

[17] Freeman, 369 F.3d at 862.

[18] Turner, 482 U.S. at 91.

## C.    EQUAL PROTECTION CLAIM

Although it is not entirely clear from Adkins's complaint or the briefs, he appears to contend that defendants violated his Fourteenth Amendment equal protection guarantee by favoring adherents of other religions over him and the members of the YEA. To succeed on his Equal Protection claim, Adkins "must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated."[19]  "However, the Fourteenth Amendment does not demand 'that every religious sect or group within a prison ⸺ however few in numbers ⸺ must have identical facilities or personnel.'"[20] We have held that <u>Turner</u> applies to equal protection claims.[21]

Adkins has failed to provide anything more than bald, unsupported, conclusional allegations that defendants purposefully discriminated against him.  To hold meetings at Coffield, every religious group (with the exception of the Muslims whose situation is governed by a separate court order) is required to have outside volunteers present.  The one concern raised by the evidence is that volunteers for the YEA are not being permitted to lead meetings following training but that volunteers for other similarly situated

---

[19]  <u>Muhammad v. Lynaugh</u>, 966 F.2d 901, 903 (5th Cir. 1992) (citing <u>McCleskey v. Kemp</u>, 481 U.S. 279 (1987).

[20]  <u>Freeman</u>, 369 F.3d at 862-63 (quoting <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n.2 (1972)).

[21]  <u>See id.</u> at 863.

religious groups are allowed to participate. Sanchez expressed a rationale for the delay in allowing the McEnanys to lead meetings on their own, however, and stated that they would be allowed to lead services alone after attending several meetings with Healan. We affirm the dismissal of Adkins's equal protection claim.

## D. RLUIPA CLAIM

Adkins insists that his inability to assemble on every Sabbath and every YEA holy day "substantially burdens" the practice of his religion, in violation of the RLUIPA. The RLUIPA was adopted by Congress in response to the Supreme Court's decisions in Employment Division, Department of Human Resources v. Smith[22] and City of Boerne v. Flores.[23] Prior to Smith, the Supreme Court had employed a "compelling state interest" standard for testing the constitutional validity of laws of general applicability that affect religious practices.[24] Government actions that substantially burdened a religious practice had to be justified by a compelling governmental interest.[25] In Smith, the Court changed course when

---

[22] 494 U.S. 872 (1990).

[23] 521 U.S. 507 (1997).

[24] See Sherbert v. Verner, 374 U.S. 398 (1963); Wisconsin v. Yoder, 406 U.S. 205 (1972).

[25] Sherbert, 374 U.S. at 402-403. Although Sherbert established the general test for free exercise challenges, the Court distinguished the prison context in Turner and O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987). Turner and O'Lone recognized that, although inmates retain their free exercise rights, incarceration necessarily limits them. See O'Lone, 482 U.S. at 348. The burden on the government to defend its actions is

12

it ruled that laws of general applicability that only incidentally burden religious conduct do not offend the First Amendment.[26] Congress sought to reinstate the pre-Smith standard by enacting the Religious Freedom Restoration Act ("RFRA").[27]  In City of Boerne, however, the Supreme Court invalidated the RFRA as it applied to states and localities, holding that the statute exceeded Congress's remedial powers under Section 5 of the Fourteenth Amendment.[28] Congress responded to City of Boerne by enacting the RLUIPA in September 2000.  The RLUIPA is largely a reprisal of the provisions of the RFRA, but its scope is limited to laws and regulations that govern (1) land use and (2) institutions such as prisons that receive federal funds.[29]

As always, we begin our review with the language of the statute.[30]  The relevant section of the RLUIPA states:

> (a) General rule

---

substantially less demanding when the prima facie constitutional claim has been made by a prisoner challenging prison policy, compared to similar claims outside the prison context.  See id. at 349.

[26] See 494 U.S. at 884-85.

[27] 42 U.S.C. §§ 2000bb, et seq.

[28] See 521 U.S. at 532-36.

[29] See 42 U.S.C. § 2000cc et seq.

[30] Coserv Ltd. Liability Corp. v. Southwestern Bell Telephone Co., 350 F.3d 482, 486 (5th Cir. 2003).

> No government shall impose a <u>substantial burden</u> on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.[31]

Initially, it falls to the plaintiff to demonstrate that the government practice complained of imposes a "substantial burden" on his religious exercise.[32]  This requires the court to answer two questions: (1) Is the burdened activity "religious exercise," and if so (2) is the burden "substantial"?

The RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to,

---

[31] 42 U.S.C. § 2000cc-1 (emphasis added).  The section only applies when "the substantial burden is imposed in a program or activity that receives Federal financial assistance" or "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes."  <u>Id.</u>  In his amended complaint, Adkins alleged that the TDCJ accepts federal funds. As defendants have not challenged this assertion, we proceed under the assumption that the TDCJ does accept federal funds.

[32] The plaintiff has the burden of persuasion on whether the challenged government practice substantially burdens the plaintiff's exercise of religion.  Once the plaintiff establishes this, the government bears the burden of persuasion that application of its substantially burdensome practice is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest.  <u>See</u> 42 U.S.C. § 2000cc-2; 146 Cong. Rec. S7776 (July 27, 2000).

14

a system of religious belief."[33]  This broad definition evinces Congress's intent to expand the concept of religious exercise that was used by courts in identifying "exercise of religion" in RFRA cases.[34]  The activities alleged to be burdened in this case —— YEA Sabbath and holy day gatherings —— easily qualify as "religious exercise" under the RLUIPA's generous definition, requiring that we answer the second question, whether the government practice in question places a "substantial burden" on Adkins's religious exercise.

What constitutes a "substantial burden" under the RLUIPA is a question of first impression in this circuit.[35]  The RLUIPA does not

---

[33] 42 U.S.C. § 2000cc-5(5).

[34] Under the RFRA, many courts required the religious exercise burdened to be "central" to the religion.  See, e.g., Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997); Abdur-Rahman v. Mich. Dept. of Corrections, 65 F.3d 489, 492 (6th Cir. 1995); Werner v. McCotter, 49 F.3d 1476, 1480 (10th Cir. 1995); Bryant v. Gomez, 46 F.3d 948, 949 (9th Cir. 1995).  The RFRA was amended by the RLUIPA's enacting legislation to incorporate the same definition for "exercise of religion" as "religious exercise" under the RLUIPA.  42 U.S.C. § 2000bb-2, as amended by Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106-274, § 7, 114 Stat. 803 (2000).  Prior to amendment, the RFRA defined "exercise of religion" as "the exercise of religion under the First Amendment to the Constitution."

[35] In Diaz v. Collins, we considered whether a substantial burden was placed on a prisoner's Native American religious exercise in violation of the RFRA.  114 F.3d 69 (5th Cir. 1997). Without defining the term, we concluded that circumscribing the use of a medicine bag and headband did not rise to the level of a "substantial burden" but grooming regulations did work a substantial hardship on the prisoner's Native American religious practice.  Id. at 72-3.  Although we did not define "substantial burden," in reaching our conclusions we cited to the Tenth Circuit definition enunciated in Werner, 49 F.3d at 1480.

15

contain a definition of "substantial burden," and the courts that have assayed it are not in agreement. Despite the RLUIPA's eschewing the requirement of centrality in the definition of religious exercise,[36] the Eighth Circuit adopted the same definition that it had employed in RFRA cases, requiring the burdensome practice to affect a "central tenet" or fundamental aspect of the religious belief.[37] The Seventh Circuit, in contrast, abandoned the definition of "substantial burden" that it had used in RFRA cases, holding instead that, "in the context of RLUIPA's broad definition of religious exercise, a...regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise...effectively impracticable."[38] Neither did the

---

[36] See text accompanying n. 33 supra.

[37] See Murphy v. Missouri Dept. Of Corr., 372 F.3d 979, 988 (8th Cir.) cert. denied, 73 U.S.L.W. 3297 (U.S. Nov. 15, 2004) (No. 04-6293) ("To constitute a substantial burden, the government policy or actions: must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.'"); see also Henderson v. Kennedy, 265 F.3d 1072, 1074 (D.C. Cir. 2001) (denying a petition for rehearing in a suit under the still valid portion of the RFRA, the court stated that the amendments to the definition of "religious exercise" did not alter the propriety of inquiring into the importance of a religious practice when assessing whether a substantial burden exists).

[38] Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003), cert. denied, 124 S.Ct. 2816 (2004) (abandoning the definition in Mack v. O'Leary, 80 F.3d 1175 (7th Cir. 1996).

16

Ninth Circuit retain the definition of "substantial burden" that it had employed in RFRA cases, which required interference with a central religious tenet or belief. Turning to Black's Law Dictionary and Merriam-Webster's Collegiate Dictionary, the Ninth Circuit defined a "substantial burden" as one that imposes "a significantly great restriction or onus upon such exercise."[39] The most recent appellate interpretation of the term under the RLUIPA is that of the Eleventh Circuit, which declined to adopt the Seventh Circuit's definition, holding instead that a "substantial burden" is one that results "from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct."[40]

The RLUIPA's legislative history, although sparse, affords some guidance: "[Substantial burden] as used in the Act should be interpreted by reference to Supreme Court jurisprudence."[41] And, indeed, on several occasions, the Court has articulated a definition of "substantial burden."

The plaintiff in Sherbert v. Verner was denied unemployment compensation benefits following the termination of her employment

---

[39] San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004) (not following the definition in Bryant v. Gomez, 46 F.3d 948, 949 (9th Cir. 1995)).

[40] Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004), petition for cert. filed, 73 U.S.L.W. 3238 (U.S. Oct. 1, 2004) (No. 04-469).

[41] 146 Cong. Rec. S7776 (July 27, 2000).

for refusing to work on Saturday, her Sabbath, coupled with her refusal to accept other employment because all identifiable job openings would have required her to work on Saturdays.[42] The Court held that a burden had been placed on the plaintiff's free exercise of her religion because the "ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand."[43]

Similarly, the plaintiff in <u>Thomas v. Review Board of the Indiana Employment Security Division</u> was denied unemployment compensation benefits after he was forced to quit his job following transfer to his employer's weapons production division; his faith as a Jehovah's Witness forbade him to engage directly in the production of arms.[44] The Court held that the denial of benefits placed a substantial burden on the plaintiff's practice of his faith:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.[45]

---

[42] 374 U.S. 398 (1963).

[43] <u>Id.</u> at 1794.

[44] 450 U.S. 707 (1981).

[45] <u>Id.</u> at 717-18.

In *Lyng v. Northwest Indian Cemetery Protective Association*, the government wanted to build a road through an area of public land that was used by several Native American tribes. The plaintiff, a Native American organization, sought to block construction of the road, arguing, among other things, that construction of the road would substantially burden the practice of their faith.[46] The Court, in denying these plaintiffs' First Amendment claim, rejected any reading of Thomas or Sherbert that implied that "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions."[47]

Our consideration of the plain wording of the statute, its legislative history, the decisions of other circuits, and the Supreme Court's pronouncements on the meaning of "substantial burden" in other contexts leads us to hold that, for purposes of applying the RLUIPA in this circuit, a government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs. And, in line with the foregoing teachings of the Supreme

---

[46] 485 U.S. 439 (1988).

[47] Id. at 450-51.

19

Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.[48] On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.[49] We emphasize that no test for the presence of a "substantial burden" in the RLUIPA context may require that the religious exercise that is claimed to be thus burdened be central to the adherent's religious belief system. This is because, as noted above, the RLUIPA defines religious exercise as "any exercise of religion, <u>whether or not compelled by, or central to</u>, a system of religious belief."[50] Nevertheless, the Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief[51] does not

_____

[48] See <u>Sherbert</u> and <u>Thomas</u>.

[49] See <u>Lyng</u>.

[50] See 42 U.S.C. § 2000cc-5(5)(emphasis added).

[51] See <u>Lyng</u>, 485 U.S. at 457-58 (criticizing the dissent's proposed test which would require a court to evaluate the "centrality" of a religious belief); <u>see</u> <u>also</u> <u>Smith</u>, 494 U.S. at 886-87 ("It is no more appropriate for judges to determine the

relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion.

In sum, we are satisfied that the position we adopt today is faithful to both the text of the RLUIPA and Supreme Court precedent. Declining to inquire into whether a practice is central to an adherent's religion avoids the greater harm, identified in Lyng and in the text of the Smith opinion, of having courts presume to determine the place of a particular belief in a religion. These precedents instruct that, like determinations regarding the importance of ideas in the free speech field, judges are ill-suited to resolve issues of theology in myriad faiths. If refusing to inquire into the centrality of a religious practice should lead to undesirable results, Congress is the appropriate body to address that problem,[52] particularly in light of its own declaration in the

_____

'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field.")

[52] Our entire discussion assumes that the RLUIPA is otherwise constitutional; we have not been asked to rule on the constitutionality of the statute. The question is currently the cause of a circuit split. Compare Benning v. Georgia, No. 04-10979, 2004 WL 2749172 (11th Cir. Dec. 02, 2004) (holding that the RLUIPA is within Congress's spending clause powers, and that it does not violate the Establishment Clause); Madison v. Riter, 355 F.3d 310 (4th Cir. 2003) (finding the RLUIPA does not violate the Establishment Clause); Charles v. Verhagen, 348 F.3d 601 (7th Cir. 2003) (holding that the RLUIPA is within Congress's spending clause powers, and that it does not violate the Establishment Clause); Mayweathers v. Newland, 314 F.3d 1062 (9th Cir. 2002) (same); with Cutter v. Wilkinson, 349 F.3d 257 (6th Cir. 2003), cert. granted,

21

text of the RLUIPA that centrality is not an element of religious exercise for purposes of this Act.

We recognize that our test requires a case-by-case, fact-specific inquiry to determine whether the government action or regulation in question imposes a substantial burden on an adherent's religious exercise; however, we perceive this kind of inquiry to be unavoidable under the RLUIPA and the circumstances that it addresses. This is why we make no effort to craft a bright-line rule.

Turning to the instant case, the evidence shows that Adkins was and is prevented from congregating with other YEA members on many Sabbath and YEA holy days. This results, however, from a dearth of qualified outside volunteers available to go to Coffield on every one of those days, not from some rule or regulation that directly prohibits such gatherings. With the exception of Muslims who are subject to a special court order, every religious group at Coffield is required to have a qualified outside volunteer present on such occasions. Presently, Adkins and the other YEA members are permitted to gather any time that Healan is available to go to Coffield; and Sanchez testified at the <u>Flowers</u> hearing that Adkins and the other YEA members would be allowed to observe every YEA Sabbath and every YEA holy day on which a free world volunteer is present.

73 U.S.L.W. 3229 (U.S. Oct. 12, 2004) (No. 03-9877) (holding the RLUIPA an unconstitutional violation of the Establishment Clause).

22

The requirement of an outside volunteer — which is a uniform requirement for all religious assemblies at Coffield with the exception of Muslims — does not place a substantial burden on Adkins's religious exercise. We admit to lingering concern about the prison authorities' refusal to allow the McEnanys to serve as volunteers so that Adkins and the other YEA members at Coffield could gather on days that Healan is not present, which in turn prevents YEA members from congregating on the same basis as other similarly situated religious groups. Our concerns are alleviated, however, by Sanchez's promise that the McEnanys will be allowed to serve as volunteers after they attend services with Healan a few times to familiarize themselves with the process of conducting such meetings. All things considered, we are convinced that the acts of the defendants have not placed a substantial burden on Adkins's free exercise of his YEA religion, within the contemplation of the RLUIPA.

## E.    Denial of Adkins's Motion to Subpoena Witnesses

Adkins's final claim is that the magistrate judge erred in refusing to allow him to subpoena defendant Reynolds, Chaplain Edwards, and inmates Bundage and Ingram. "A district court's refusal to issue a subpoena is reviewable only for abuse of discretion."[53] Before we will hold that the district court abused its discretion by refusing to issue a subpoena, the proponent of

_____

[53] Gibbs v. King, 779 F.2d 1040, 1047 (5th Cir. 1986).

23

the subpoena must show that relevant testimony was excluded, or that a substantial need for a witness's trial testimony existed.[54] Much of the information that Adkins claims the witnesses would testify to would be speculative or repetitive. Although it appears from Ingram's affidavit that he had some personal knowledge of the use of the chapel, this was not made at all clear in Adkins's subpoena request, so the magistrate judge did not abuse his discretion in refusing the subpoena request. We perceive no abuse of discretion here.

### III. CONCLUSION

For the foregoing reasons, the district court's rulings and its dismissal of Adkins's claims, are, in all respects, AFFIRMED.

---

[54] See Cupit v. Jones, 835 F.2d 82, 86-87 (5th Cir. 1987).