# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 5, 2025

Lyle W. Cayce
Clerk

No. 23-50235

_____

William Washington,

*Plaintiff—Appellant*,

*versus*

Marsha McLane, *Executive Director, Texas Civil Commitment Office*;
Jessica Marsh, *Deputy Director, Texas Civil Commitment Office*;
Amanda Beltran, *Case Manager, Texas Civil Commitment Office*;
Rachel Kingston, *Case Manager, Texas Civil Commitment Office*;
James Winckler, *MTC Chief of Security*; Michael Arenivaz,
*Security Office*,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-521

_____

Before Higginbotham, Stewart, and Haynes, *Circuit Judges*.
Per Curiam:[*]

William Washington, a person civilly committed for being a sexually violent predator, raises one issue on appeal: Is a policy prohibiting marriage

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

between two civilly committed people unconstitutional?  Having considered the case before us, we answer no.

## I.    Background

William Washington is housed in a commitment facility for sexually violent predators ("SVPs").  *See In re Commitment of Washington*, No. 09-11-00658-CV, 2013 WL 2732569, at *5–7 (Tex. App.—Beaumont June 13, 2013, pet. denied) (mem. op.); *see generally* TEX. HEALTH & SAFETY CODE § 841.001.  SVPs are "likely to engage in repeated predatory acts of sexual violence," requiring "long-term supervision and treatment."  TEX. HEALTH & SAFETY CODE § 841.001.

The Texas Civil Commitment Office ("TCCO") treats and supervises SVPs.  *Id.* § 841.007.  The overarching goal of treatment and supervision is "to provide the SVP with the necessary tools to eventually be released to the community and live a productive life free from offending behavior."  To achieve that goal, TCCO develops and implements policies with the help of experts.

One of those policies is the subject of this case: TCCO forbids residents from marrying each other.  During his commitment, Washington fell in love with Katie Layton, another resident.  Eventually, Washington proposed, and Layton accepted.  But, in compliance with the policy forbidding marriages between residents, TCCO did not endorse Washington's marriage request.

No. 23-50235

Washington sued, asserting that the marriage policy is unconstitutional.[1]  The district court granted Defendants' motions for summary judgment on all claims.  Washington appeals.

## II.    Jurisdiction

Defendants raise two jurisdictional issues for us to decide for the first time on appeal—sovereign immunity and standing.[2]

Sovereign immunity generally forbids suit against state officials in their official capacities.  *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019).  This principle is subject to several exceptions, including *Ex parte Young*, 209 U.S. 123 (1908).  *Ex parte Young* allows suits for prospective relief against state officials in their official capacities for ongoing violations of federal law.  *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc).

*Ex parte Young* and standing analysis "significantly overlap."  *City of Austin*, 943 F.3d at 1002 (quotation omitted).  To establish standing, Washington must satisfy three elements—injury in fact, causation, and redressability.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Defendants assert that Washington's suit should be dismissed because (1) Washington seeks impermissible relief, (2) an independent state law causes Washington's injury, and (3) Washington sues the wrong parties.

---

[1] Washington asserted additional claims in the district court, but the constitutional validity of the marriage policy is the only issue on appeal.  He does not appeal the dismissal of his claims against the MTC officers.  Accordingly, the TCCO Defendants (hereinafter "Defendants") are the only defendants relevant to this appeal.

[2] Waiver is not an issue here.  Although the district court did not address sovereign immunity, Defendants raised the issue below.  Meanwhile, standing cannot be waived.  *Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494, 496 n.1 (5th Cir. 2007) (en banc) ("Standing is a jurisdictional requirement and not subject to waiver.").

No. 23-50235

The first implicates sovereign immunity, the second implicates standing, and the third implicates both.

## A. Relief

*Ex parte Young* allows suits against officers in their official capacities for prospective injunctive relief. *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011). Defendants assert that Washington seeks invalid relief—a mandatory injunction directing the state to promulgate a new policy. Defendants do not point to the portion of Washington's complaint that raises their concern. Although Washington's complaint, like many pro se complaints, is not written with the expertise of a seasoned lawyer, Washington includes an entirely valid request for relief—nonenforcement of the challenged policy. *See Edelman v. Jordan*, 415 U.S. 651, 664 (1974). Accordingly, Washington's requested relief does not bar suit.

## B. Independent State Law

Defendants assert that a Texas law independently causes the same injury as the TCCO policy, creating problems for standing's causation and redressability requirements. *See Renne v. Geary*, 501 U.S. 312, 319 (1991). Texas law requires marriage applicants to present in person before the clerk. TEX. FAM. CODE § 2.002(1). However, Defendants assume without explanation that Washington would not be allowed to present in person before the clerk. Indeed, TCCO's chaperone policy contemplates residents leaving the facility for "appointments" and "other outings as approved by the Treatment Team."[3]

---

[3] TCCO Policy 3.4 § III(A), https://tcco.texas.gov/sites/tcco/files/documents/policies/policy-3-4-approval-contacts-chaperones.pdf [https://perma.cc/T9EE-KH6G].

4

In other words, the state law does not render Washington's marriage an impossibility. Although the chaperone policy is one additional step Washington must overcome to be married, that does not leave us without jurisdiction. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) (concluding that a contractor had standing even though the contractor had many additional hoops to jump through—securing financing, qualifying for subsidies, and construction). The independent state law thus does not block Washington's suit.

### C. Parties

Under *Ex parte Young*, the proper defendant has a "particular duty to enforce the [law] in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). This analysis implicates standing's traceability and redressability requirements, so we analyze standing and *Ex parte Young* together. *City of Austin*, 943 F.3d at 1002.

Washington sues TCCO Executive Director Marsha McLane, Deputy Director Jessica Marsh, and Case Managers Rachel Kingston and Amanda Beltran.

Starting with McLane and Marsh: McLane and Marsh possess the requisite enforcement authority and are thus proper defendants. TCCO policy gives "Facility Administration" and "TCCO management" final say over proposed unions and partners. As the leaders of TCCO with "direct governing authority" over TCCO employees, McLane and Marsh have final say. *Jackson v. Wright*, 82 F.4th 362, 366–68 (5th Cir. 2023). In addition to McLane and Marsh's supervisory authority, they ignored Washington's written requests for permission to marry Layton. *See id.* (concluding that members of board of regents were proper defendants given their supervisory authority and their role in enforcement as evidenced by their failure to

respond to plaintiff's letter seeking relief). When Washington met with Marsh, Marsh explained that she "would not allow" Washington's marriage. *See K.P. v. LeBlanc*, 627 F.3d 115, 125 (5th Cir. 2010) (examining state board members' active role in enforcement).

Additionally, suit against McLane and Marsh is analogous to suits against wardens of prisons, which have long been deemed acceptable under *Ex parte Young*. *See, e.g.*, *Brennan v. Stewart*, 834 F.2d 1248, 1252 n.6 (5th Cir. 1988). Like wardens, McLane and Marsh have the authority to "compel or constrain" the conditions of Washington's civil confinement, power to implement TCCO's marriage policy, and supervisory authority over the people who dealt more directly with Washington's marriage request. *Hope v. Harris*, 861 F. App'x 571, 578 (5th Cir. 2021) (per curiam); *see Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). McLane and Marsh are thus proper defendants under *Ex parte Young*. Further, McLane and Marsh's role enforcing the policy satisfy standing's causation and redressability requirements.

Defendants assert that the only proper defendants under *Ex parte Young* would be Washington's case manager and treatment provider because the challenged policy vests them with authority to endorse marriage applications. This unduly narrow view ignores McLane's and Marsh's roles in enforcing the policy.

In addition, Washington sued a case manager—Amanda Beltran. As a case manager who failed to endorse Washington's marriage request, even after speaking to Washington about the request, Beltran has enforcement authority and neither *Ex parte Young* nor standing preclude suit against her.

That leaves one remaining defendant: Rachel Kingston. She can be dispensed of quickly. Washington does not make the case for why we have jurisdiction over the claims against Kingston (with respect to sovereign

immunity or standing), so we must dismiss those claims without prejudice, as opposed to the with-prejudice dismissal below. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) ("[T]he plaintiff constantly bears the burden of proof that jurisdiction does in fact exist"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that a plaintiff "invoking federal jurisdiction bears the burden of establishing" standing); *Carver v. Atwood*, 18 F.4th 494, 498 (5th Cir. 2021) ("Our precedents also make clear that a jurisdictional dismissal must be *without* prejudice to refiling in a forum of competent jurisdiction.").

In sum, we dismiss Washington's claims against Beltran for lack of jurisdiction. But Washington's suit against McLane, Marsh, and Beltran clears the jurisdictional hurdles of standing and sovereign immunity, so we proceed to the merits.

## III.   Discussion

We review a grant of summary judgment de novo. *See Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 414 (5th Cir. 2021). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

In evaluating the motion for summary judgment, we distinguish between disputed issues of fact and disputed issues of professional judgment: For the former, we draw all reasonable inferences in Washington's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). For the latter, given that civil confinement institutions are better equipped to run their facilities than courts, we defer to TCCO. *See Beard v. Banks*, 548 U.S. 521, 530 (2006).

Washington raises one issue on appeal—the constitutional validity of TCCO's policy preventing him from marrying another resident. Our

inquiry is based on, but not identical to, similar inquiries in the context of prisons. *Turner* propounds the standard for adjudging alleged constitutional violations in prisons: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Four factors are relevant in determining the regulation's reasonableness:

(1) whether a "valid, rational connection exists between the prison regulation and the legitimate governmental interest put forward to justify it,"
(2) whether there exist "alternative means of exercising the fundamental right that remain open to prison inmates,"
(3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and
(4) whether there is an "absence of ready alternatives" to the regulation in question.

*Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (alteration omitted) (quoting *Turner*, 482 U.S. at 89–90). The burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). This deferential standard recognizes that prison administrators—rather than the courts—are best suited to make the difficult judgments associated with daily prison administration.

Importantly, *Turner* addresses the constitutional rights of prisoners, not civilly committed residents like Washington, so we apply a modified standard. *Bohannan v. Doe*, 527 F. App'x 283, 294–95 (5th Cir. 2013) (per curiam); *Dunsmore v. McLane*, No. 21-50541, 2022 WL 3210681 (5th Cir. Aug. 9, 2022) (per curiam). We still ask whether a regulation that impinges on civilly committed residents' constitutional rights is reasonably related to legitimate interests, but the legitimate interests of prisons and civil

confinement facilities are different.   Punishment is a permissible goal of prisons; not so in civil confinement. *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982) (noting that civilly confined persons "may not be punished at all"). Instead, rehabilitation and security are permissible aims under *Turner*. *Bohannan*, 527 F. App'x at 294–95.   With that in mind, we evaluate the policy's constitutionality on its face and as applied.

## A. Constitutionality of the Policy

Civilly committed residents retain the right to marry.  *See Turner*, 482 U.S. at 95 (concluding that prisoners retain the right to marry).  The question is whether TCCO's infringement on that right passes constitutional muster. To answer that question, we look to the *Turner* factors.

### 1. *Valid, rational connection between challenged policy and governmental interest*

TCCO maintains "twin goals of 'long-term supervision and treatment of sexually violent predators.'" *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) (per curiam) (quoting Tex. Health & Safety Code § 841.001)).  Based on the evidence before us, which consists of several declarations from TCCO officials and employees, the policy is validly and rationally connected to those goals.

According to those declarations, which are entitled to deference, experts broadly agree that resident-resident relationships should be forbidden given many residents' inability to be appropriate partners for each other.  Many residents have "not yet mastered the management of deviant impulses, fantasies, distorted thinking or controlling behavior," which precludes such residents from engaging in a healthy relationship with another resident.    Further, allowing resident-resident relationships would be complicated, resulting in "differing privileges" that "could result in a power imbalance" and "unhealthy behaviors" such as manipulation or coercion.

TCCO also forbids intra-facility relationships "due to the potential for disruption of both clients' treatment"; this potential disruption "is further intensified in a confined facility environment." Past instances of unapproved intra-facility relationships resulted in physical altercations over jealousy issues, requests for protection after ending the relationship, and a resident taking his GPS monitor off, which is a felony, after a relationship ended.

The judgment of TCCO officials is entitled to deference, *Thornburgh v. Abbott*, 490 U.S. 401, 407–09 (1989), and TCCO's evidence displays legitimate concerns associated with allowing residents to be in a relationship with each other. Washington fails to produce contrary evidence, and his attempts to rebut Defendants' rationale do not overcome the deference to which TCCO's judgment is entitled. Thus, this factor favors Defendants.[4]

### 2. *Alternative means of exercising the right*

The parties agree that no alternative means of exercising the right to marry exist.

---

[4] Washington points to *Turner* for support. In *Turner*, the Court held unconstitutional a policy forbidding marriage except in the case of pregnancy or to legitimize a child. 482 U.S. at 96. However, *Turner* is distinguishable. First, the population of TCCO is different than the population of the prison in *Turner*. TCCO houses SVPs, an identifying characteristic of which is difficulty forming appropriate relationships. Marriage necessarily implicates that characteristic, so regulating the marriage right at TCCO may have therapeutic value that it may not have for the general population of a prison. Second, *Turner* never propounded an absolute right to marry in prison; instead, *Turner* acknowledged that the right to marry may be subject to certain restrictions. *Id.* at 95 ("The right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration."). Because the restriction at issue here is rationally related to legitimate interests, *Turner* does not stand in Defendants' way.

### 3. *Impact of accommodating asserted right on guards, other residents, and allocation of prison resources*

Defendants' evidence shows that allowing intra-facility marriage would require increased coordination between security, mental health, and health services staff, along with increased administrative burdens. SVPs are often incapable of entering into healthy relationships, and when those relationships fail, facilities receive requests for transfers and additional accommodations. Specific instances of resident interactions corroborate TCCO's concern that allowing residents to marry each other could cause institutional disruption. *Cf. Thornburgh*, 490 U.S. at 407 (observing that "officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the security and order of the prison"). Defendants have shown that, at a small facility like TCCO, which has limited resources, the policy change would have too large a ripple effect. *See Turner*, 482 U.S. at 90; *Stauffer v. Gearhart*, 741 F.3d 574, 585 (5th Cir. 2014). This factor favors Defendants.

### 4. *Absence of ready alternatives at de minimis cost*

Washington points to one potential alternative—evaluate intra-facility marriage requests case by case. However, that alternative would not "fully accommodate[] the asserted right" because, as discussed above, the evidence suggests that SVPs in TCCO custody are, by definition, still undergoing treatment, and are not appropriate partners for each other. *Overton*, 539 U.S. at 136; *cf. Beard*, 548 U.S. at 528 ("[C]ourts . . . owe substantial deference to the professional judgment of prison administrators." (internal quotation marks and citation omitted)). Accordingly, Washington

No. 23-50235

does not meet his burden of showing a ready alternative at de minimis cost. *See Overton*, 539 U.S. at 132.[5]

In sum, three of four factors favor the constitutionality of banning resident-resident marriage. Balancing the factors, the one in Washington's favor does not outweigh the other three, so Washington's facial challenge fails.

### B. As-Applied Challenge

For an as-applied challenge, the question is whether application of the regulation to Washington is rationally related to the legitimate interests asserted by the facility. *See Prison Legal News v. Livingston*, 683 F.3d 201, 215 (5th Cir. 2012). It is Washington's burden. *See id.*

Turning to the *Turner* factors: Again, there are no adequate alternatives to marriage, so the second *Turner* factor weighs in favor of Washington.

However, the remaining *Turner* factors weigh in Defendants' favor. As discussed above, the policy serves Defendants' legitimate interests, and Washington does not provide a persuasive reason that his relationship should be treated differently from other intra-facility relationships. *See Prison Legal News*, 683 F.3d at 216 (displaying the high standard for succeeding on an as-applied challenge under *Turner* by framing the inquiry as whether plaintiff has "produced evidence that contradicts the rationality" of the policy). Washington highlights the benefits of his relationship with Layton, but that does not undercut the legitimate reasons to apply the policy to Washington.

---

[5] Defendants assert that Washington's concession that *some* intra-facility marriages may be appropriately disallowed is incompatible with the nature of facial challenges, which generally require that a statute be unconstitutional in *all* applications. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

No. 23-50235

As discussed above, Defendants' evidence tends to show that Washington and Layton, as SVPs, are not capable of being appropriate partners for each other, and their partnership may undermine their treatment and strain administrative resources. Indeed, Washington's relationship with Layton has already caused emotional strife for Washington, and he has prioritized his relationship with Layton above following other TCCO policies. Because Washington's evidence does not contradict the rationality of TCCO's application of the ban, the as-applied challenge fails.

## IV.    Conclusion

We are without jurisdiction as to Kingston, so we must VACATE in part, REVERSE in part, and REMAND with instructions to dismiss claims against Kingston without prejudice. We AFFIRM the grant of summary judgment as to the remaining defendants.