

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-2-2007

# Washington v. Klem

Precedential or Non-Precedential: Precedential

Docket No. 05-2351

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Washington v. Klem" (2007). *2007 Decisions.* Paper 516.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/516

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No:  05-2351

HENRY WASHINGTON

v.

SUPERINTENDENT EDWARD KLEM;
DEPUTY SUPT. JOSEPH PIAZZA;
JOHN MACK, Programs Coordinator;
SGT. DOUGHERTY, Property Room Supervisor

Henry Unseld Washington,

Appellant


On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No. 01-CV-02432
District Judge: The Honorable John E. Jones, III

Argued April 10, 2007

Before: SMITH, NYGAARD, and HANSEN, *Circuit Judges**

(Filed: August 2, 2007)

Counsel:

Nancy Winkelman
Edward D. Manchester (argued)
Schnader Harrison Segal & Lewis LLP
1600 Market St., Suite 3600
Philadelphia, PA 19103
*Counsel for Appellant*

Thomas W. Corbett, Jr., Attorney General
Howard G. Hopkirk, Senior Deputy Attorney General
(argued)
John G. Knorr, III, Chief Deputy Attorney General, Chief,
        Appellate Litigation Section
Office of Attorney General
Appellate Litigation Section
15th Fl., Strawberry Square
Harrisburg, PA 17120
*Counsel for Appellee*

———————————————

OPINION OF THE COURT
———————————————

SMITH, *Circuit Judge*.

———————————————

*The Honorable David R. Hansen, Senior United States Circuit Judge for the Court of Appeals for the Eighth Circuit, sitting by designation.

2

This case requires us to define "substantial burden" under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc *et seq*, to determine whether the Pennsylvania Department of Corrections' (DOC's) restriction on inmates that they possess in their cells only ten books at a time substantially burdens inmate Henry Unseld Washington's religious exercise. We hold that it does. Because the DOC is unable to show that its ten-book policy is the least restrictive means to further its compelling governmental interest in the safety and health of prisoners and prison employees, we will reverse the District Court's order dismissing Washington's RLUIPA claim and remand with instructions to consider whether any factual issues remain when that claim is evaluated under the proper legal standard.

I.

Henry Unseld Washington is an inmate in the custody of the Pennsylvania DOC who has attempted to practice his religion while incarcerated. Washington founded and has been a practitioner of the Children of the Sun Church for over two decades. According to Washington, the Children of the Sun Church supports the development of "Pan-Afrikanism" whereby adherents to the religion stress that "only through Pan-Afrikanism can Afrikan people worldwide, be able to change the conditions of Afrikan people in the diaspora and the motherland." To this end, Washington's Church states that "[f]or every Afrikan's eyes you open with his teachings you will gain rewards in the life everafter." One of the rituals requires a practitioner to read four different Afro-centric books per day.[1]

---

[1]Washington quotes Church doctrine to require "a daily reading of Afrokentrick books, newspaper, newsletters,

This ritual is aimed at educating the adherent to doctrine, so that he is able to teach others more effectively. Washington views this ritual as necessary to his Church's proselytization requirement, so that the books "are in essence the religion itself."

The Pennsylvania DOC limits the amount of property any inmate may store in his cell. The DOC's policy states that "limitations on the amount and variety of inmate property may be imposed for security, hygiene and/or safety reasons." With respect to publications, each inmate is permitted to retain three newspapers, ten magazines, and ten books, "unless additional books are approved by the facility's education department." This provision applies to every prison in the Pennsylvania DOC.[2] The DOC also permits "storage space equal to four records center boxes. This space may be made up of the four records center boxes or one footlocker and two records center boxes. In cells that have either a built-in or a free standing storage cabinet, the inmate is permitted to use that space and either two records center boxes or one footlocker."

The conflict in this case arises from the clash between Washington's interest in practicing what he claims is his religion

---

magazines, etc., (at least four different sources on the same topic a must !!!) view Afrikan-centerd books, plays, dances, etc." While this statement seems to permit Washington to use non-books to fulfill the four source requirement, the Pennsylvania DOC stipulates that Washington is supposed to read four books per day as part of his religious practice.

[2] Some of the DOC's policies have been revised, but not in any way that is significant for the purposes of this appeal.

and the prison's interest in limiting, for security, hygiene, and safety reasons, the amount of inmate property that may be held in a cell. In July 2000, Washington was transferred from the State Correctional Institution (SCI) at Mahanoy to SCI-Retreat. In February 2001, Washington's books, religious literature, and legal materials arrived at SCI-Retreat in thirteen boxes. In December 2001, authorities at SCI-Retreat informed Washington that he was in possession of property in his cell that exceeded the amount of property permitted. The excess property was removed from Washington's cell, although authorities permitted Washington to choose which ten books to keep in his cell. SCI-Retreat authorities gave Washington the option of mailing the books out of the prison or having the books destroyed by the DOC because of a lack of adequate storage space for excess inmate property. The Superintendent of SCI-Retreat wrote to Washington personally, stating that Washington could also donate the books to the prison library so he could still access them on an as-needed basis. The prison, though, had a policy limiting the number of trips an inmate could take to the library to one per week. Library policy allowed inmates to check out four books per visit.[3] SCI-Retreat

---

[3]As Washington notes, the defendants raise for the first time on appeal that Washington could have donated his excess books to the prison library, and thereby have access to them. Before the District Court, the defendants argued that Washington could ship the books to someone outside the prison or allow the books to be destroyed. Washington now argues that, by failing to raise this issue previously, the defendants have waived it. Prison officials did offer Washington the option to donate these books, but did so in a December 7, 2001 letter from the Warden. This letter was sent on the same day Washington filed suit, and by its own terms, the offer would expire on December 10, 2001.

did not destroy the property, and shipped it to SCI-Albion when Washington was transferred there in December 2002.

Washington, proceeding pro se, sued several employees of Pennsylvania's DOC pursuant to 42 U.S.C. § 1983 and 42 U.S.C. §§ 2000cc – 2000cc-5 (the Religious Land Use and Institutionalized Persons Act of 2000, or RLUIPA) in December 2001. His suit alleged that the ten-book policy violated his First Amendment rights and the terms of RLUIPA. The District Court denied preliminary injunctive relief and found that, because Washington's books had been mailed to his mother, they were not in danger of being destroyed. The District Court subsequently granted the defendants' motion to dismiss on all counts in May 2003. The District Court dismissed Washington's RLUIPA claim because he had not shown that SCI-Retreat is an institution receiving federal funds (a prerequisite for a RLUIPA claim). In April 2004, however, this Court reversed and remanded the case with respect to the RLUIPA claim because Washington could easily show that SCI-Retreat receives federal funds. *See Washington v. Klem*, No. 03-2584 (unreported-not precedential). In the same opinion, we affirmed the District Court's dismissal of all non-RLUIPA claims, and expressed no opinion as to the merits of the RLUIPA claim. On remand, in December 2004 the District Court granted the defendants' motion for summary judgment and denied Washington's motion for summary judgment. The

Whether this argument has been waived is of no moment, because the offer was not accompanied by an alteration in the prison's policy that Washington could go to the library more than once a week. The library policy permitting visits once a week and check-outs four at a time necessarily made it impossible for Washington to read four books per day.

6

District Court based its dismissal of Washington's RLUIPA claim on several factors. The District Court found that the Pennsylvania DOC receives federal funds. It also found that Washington's beliefs are sincerely held, and noted that this point was not contested by the Pennsylvania DOC. However, the District Court concluded that the DOC policy did not impose a substantial burden on Washington's religious practice, the policy furthered a compelling governmental interest, and the policy used the least restrictive means to further this interest. This timely appeal followed.[4]

II.

A.    A General Note About RLUIPA

Congress passed RLUIPA to grant heightened protection to prisoners from burdens imposed by the government. RLUIPA also contains a land-use provision not applicable in this case. The history of this law traces back to the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990). The Supreme Court in *Smith* held that the Free Exercise Clause of the First Amendment does not impede the enforcement of neutral and otherwise valid laws of general applicability that incidentally burden religious conduct. *Id*. at 878-82, 885. The Court did state that the political branches could grant a higher degree of protection for religious exercise through legislative

---

[4]The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over an order resolving cross-motions for summary judgment. *Cantor v. Perelman*, 414 F.3d 430, 435 n.2 (3d Cir. 2005) (citation omitted).

7

accommodation.  *Id*. at 890.   Taking the cue from *Smith*, Congress passed the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. §2000bb *et seq*.  RFRA prohibited the Government from substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability, unless the Government could demonstrate that the application of the burden was in furtherance of a compelling governmental interest and was the least restrictive means of furthering that compelling governmental interest.   As applied to the states, RFRA was struck down by the Supreme Court because it exceeded Congress' remedial powers under the Fourteenth Amendment. *City of Boerne v. Flores*, 521 U.S. 507, 532-36 (1997).  The dialogue between Congress and the Supreme Court continued when Congress enacted RLUIPA.  The key difference between RFRA and RLUIPA is that RLUIPA invokes its power to regulate under the Spending and Commerce Clauses, and protects only land-use regulation and prisoners.  *See Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005).

RLUIPA also does not confer any "privileged status on any particular religious sect, and singles out no bona fide faith for disadvantageous treatment."  *Id*. at 724.  In addition to not differentiating between bona fide faiths, RLUIPA does not permit a court to determine whether the belief or practice in question is "compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(a); *Cutter*, 544 U.S. at 725 n.13; *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1032 (9th Cir. 2007).  RLUIPA does permit inquiry into the sincerity of a prisoner's religious beliefs.  *Cutter*, 544 U.S. at 725 n.13.

B.      Strict Scrutiny Under RLUIPA

8

Section 3 of RLUIPA states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc-1(a). If the plaintiff "produces prima facie evidence to support a claim alleging a [RLUIPA] violation . . . the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether [the challenged practice or law] substantially burdens the plaintiff's exercise of religion." *Id*. § 2000cc-2(b). For the purposes of RLUIPA, "government" includes any official of a "State, county, municipality, or other governmental entity created under the authority of a State," as well as any other person "acting under color of State law." *Id*. § 2000cc-5(4)(A).

### 1. Substantial Burden

A plaintiff-inmate bears the burden to show that a prison institution's policy or official practice has substantially burdened the practice of that inmate's religion. Both the text of the statute and the legislative history provide support for how the statute should be interpreted with respect to what qualifies as a "substantial burden." Legislative history on this point has been cited by the Supreme Court approvingly in *Cutter*. Despite the limitations inherent in most legislative history as a tool for use in statutory interpretation, here that history as been cited by the Supreme Court approvingly in *Cutter*. *Cf. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (describing some of the criticisms of legislative history to interpret the meaning of a statute).

9

Senators Hatch and Kennedy, two principal sponsors of RLUIPA, discussed the statute in a Joint Statement that appeared in the Congressional Record. The Joint Statement's section on the definition of substantial burden states that:

> [t]he Act does not include a definition of the term "substantial burden" because it is not the intent of this Act to create a new standard for the definition of "substantial burden" on religious exercise. Instead, *that term as used in the Act should be interpreted by reference to Supreme Court jurisprudence*. Nothing in the Act, including the requirement in Section 5(g) that its terms be broadly construed, is intended to change that principle. The term "substantial burden" as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise.

146 CONG. REC. S7774, 7776 (July 27, 2000) (emphasis added). Section 5 of RLUIPA provides the Act's Rules of Construction. Section 5(g) states that "[t]his Act shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the Constitution." 42 U.S.C. § 2000cc-3(g). The legislative history and the Act's Rules of Construction illustrate that "substantial burden" should be interpreted broadly, but in line with prior Supreme Court precedent. The Supreme Court has defined "substantial burden" in the Free Exercise Clause context, and several courts of appeals have looked to this line of cases to interpret what the phrase means for RLUIPA purposes. *See, e.g.*, *Lovelace v. Lee*,

10

472 F.3d 174, 187 (4th Cir. 2006); *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005); *Adkins v. Kaspar*, 393 F.3d 559, 569 (5th Cir. 2004).

This clear methodology runs into trouble, however, because Supreme Court precedent with respect to the definition of "substantial burden" in the Free Exercise Clause context has not always been consistent. *See, e.g.*, *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1226-27 (11th Cir. 2004) (discussing the various standards). Further, transferring these definitions, which often arise in the denial of unemployment benefits, to a prison setting has not always been seamless because of the different factual scenarios presented by the institutional milieu. Nonetheless, the Supreme Court has stated in its Free Exercise Clause jurisprudence that a substantial burden exists when a follower is forced "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). In *Sherbert*, the Court addressed whether a Seventh Day Adventist who was religiously precluded from working on Saturdays could be denied unemployment compensation because she could not find work that would permit her to observe this precept of her religion. The Court concluded that the Government could not deny unemployment benefits, as such a practice essentially forced Sherbert to choose between her religion and government benefits provided to others who do not have a similar religious belief. In a footnote, however, the Supreme Court seemed to imply that a substantial burden exists whenever a government action has the "tendency to inhibit constitutionally protected activity." *Id.* at 406 n.6.

The Court in a later case purportedly followed *Sherbert*,

11

but restated the "substantial burden" definition. *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 717-18 (1981). The Court stated:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Id. See also Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 141 (1987) (quoting *Thomas*). The current status of this test is not entirely clear because of a later Supreme Court decision that contains some language which may be read to lower the hurdle for showing a substantial burden. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988).

In *Lyng*, the Supreme Court found no substantial burden where the federal government planned to harvest timber and build a highway through part of a National Forest used for religious purposes by members of three Native American religions. The members claimed that the noise and pollution from the highway would "diminish the sacredness of the area" and interfere with the religious experience of the members using the area. *Id.* at 448. The Court rejected the position that "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their

religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions." *Id*. at 450-51. The Court made this statement in the context of rejecting the plaintiffs' reading of, inter alia, *Sherbert* and *Thomas*. *See Adkins*, 393 F.3d at 569. The Court did not declare that it was altering the holdings of *Sherbert* or *Thomas*. Nor did the Court hold that its conclusion must be read to mean that *any* incidental effect of a government program which may have *some* tendency to coerce individuals into acting contrary to their religious beliefs satisfies the substantial burden standard.

The courts of appeals to have addressed the definition of "substantial burden" under RLUIPA have defined it in several ways. Most of those courts have adopted some form of the *Sherbert*/*Thomas* formulation, but have often reworded their holdings. The result of this practice has been to create several definitions of "substantial burden" with minor variations.[5]

---

[5]*See Spratt v. Rhode Island Dept. of Corrs.*, 482 F.3d 33 (1st Cir. 2007) (assuming, arguendo, that the *Thomas* standard applies); *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (stating that, "for RLUIPA purposes, a substantial burden on religious exercise occurs when a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs" (quoting *Thomas*)); *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) ("[A] government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs. And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand,

Whether or not these semantic differences in definition result in any meaningful differences in application is, for the most part, an open question.[6]  In an effort to harmonize the "substantial

enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.  On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed."); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (stating that a substantial burden in the land use context "is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (explaining that "a substantial burden can result from pressure that *tends to force* adherents to forego religious precepts or from pressure that mandates religious conduct") (emphasis added); *Warsoldier v. Woodford*, 418 F.3d 989, 995-96 (9th Cir. 2005) (stating that a substantial burden exists where the government conduct "impose[s] a significantly great restriction or onus upon [religious] exercise," or where the government conduct puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs" (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) and *Thomas*).  The standards from the Seventh and Eleventh Circuits appear to be at opposite ends of the definitional spectrum.

[6]*But see Murphy v. Missouri Dept. of Corrs.*, 372 F.3d 979, 988 (8th Cir. 2004) (still requiring the government policy/action to substantially burden a "central tenet" of the individual's religious beliefs, even though RLUIPA explicitly protects religious exercise that includes activities not necessarily central

14

burden" jurisprudence, we adopt a disjunctive test that couples the holdings of *Sherbert* and *Thomas*. For the purposes of RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.[7]

This definition accords with § 5(g) of RLUIPA and the statute's legislative history in that it recognizes that Congress intended to create a broad definition of substantial burden. We recognize that this definition is narrower than the dictum in footnote six of *Sherbert* and the negative implication of *Lyng*, but is still broad enough to accurately reflect the statute's plain text and to effect its purpose. Using an expansive definition of "substantial burden" derived from language not essential to the holdings of either *Sherbert* or *Lyng* poses at least two problems. First, post-*Sherbert*, the Supreme Court has not squarely adopted its dictum in footnote six of *Sherbert* as a holding in a Free Exercise or RLUIPA case. Second, there is reason to question whether *Lyng* can be read to hold that *any* incidental effect of a government program which may have *some* tendency to coerce individuals into acting contrary to their religious

to a system of religious belief).

[7]We believe that the Fifth Circuit in *Adkins* enunciated the proper standard for what constitutes a substantial burden under RLUIPA. The *Adkins* definition incorporates the holdings of both *Sherbert* and *Thomas*, while also requiring that the burden on religious exercise actually be substantial. 393 F.3d at 570.

beliefs satisfies the substantial burden standard. Such a reading fails to take into account that the discussion of "substantial burden" in *Lyng* occurred while the Court approvingly discussed *Sherbert* and *Thomas*. The "any incidental effect/some tendency" standard would also conflict with other statements in *Lyng* where the Court decided whether the Government's actions constituted a substantial burden. *See Lyng*, 485 U.S. at 451 (no substantial burden even though "we can assume that the threat to the efficacy of at least some religious practices is extremely grave"); *id.* at 452 ("However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires.").

In interpreting the definition of "substantial burden," we must keep in mind the plain text of the statute. Adopting the negative implication of the Supreme Court's holding in *Lyng* would read "substantial" out of the statute. *See Civil Liberties for Urban Believers*, 342 F.3d at 761 (stating, in the land use context, that "[a]pplication of the substantial burden provision to a regulation inhibiting or constraining *any* religious exercise ... would render meaningless the word 'substantial'"). The straightforward test we adopt today, derived directly from Supreme Court precedent, respects the text and purpose of RLUIPA while seeking to clarify unnecessary confusion on this issue.

With this groundwork laid, we now apply this definition to the case before us. In our view, the Pennsylvania DOC's ten-book limitation in a prisoner's cell constitutes a substantial burden which impedes Washington from exercising his professed religion.

Washington argues that the ten-book limitation places a substantial burden on his religious exercise because it prevents him from reading four books per day and teaching others about the African people. Washington's religion requires a daily reading of four Afro-centric books. Further, Washington argues that his ability to teach others about the African people exists only to the extent that he himself has learned about the African people.

The Pennsylvania DOC contends that limiting the number of books that Washington may keep in his cell at any one time does not significantly inhibit or constrain his conduct, or the expression, of his religious beliefs. This book limitation, it asserts, does not prohibit Washington from adhering to his faith or deny him the opportunity to engage in activity fundamental to his religion. The Pennsylvania DOC also argues that its regulations do not render Washington's religious exercise effectively impracticable.

The District Court took a similar stance when it held that the exercise of Washington's religion was not substantially burdened by the Pennsylvania DOC's policy. Notably, the definition of "substantial burden" used by the District Court came from a pre-RLUIPA Eighth Circuit case from 1997, and at least one prong of the definition adopted in that case contained the central tenet requirement that has since been prohibited by the express terms of RLUIPA.[8] Another prong required the

---

[8]The full definition of substantial burden used by the District Court, which quoted from *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997), stated that "A substantial burden is: governmental action that must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's

religious activities to be "fundamental" to the person's religion. The District Court concluded that "a palatable alternative exists" for Washington to practice his religion. Specifically, Washington still possessed some books that would impart knowledge about his religion and the District Court found "it hard to believe that Washington does not possess significant knowledge of the beliefs and teachings of his religion to teach others in an oral tradition." The District Court stated that its conclusion was not altered in any way by the fact that Washington's exchange of old books for new books must occur by having outsiders supply Washington with books which he can exchange for others in his cell.

The position espoused by the Pennsylvania DOC and adopted by the District Court is incorrect. The DOC has, for whatever reason, elected not to challenge the sincerity of Washington's religious beliefs. The brief for the DOC prison officials states that those officials "do not dispute that Washington's beliefs are sincerely held religious beliefs and that the books are necessary to enable him to fulfill his religious missionary work." The District Court has acknowledged this sincerity of belief and that books are necessary to enable him to fulfill his religious missionary work. The District Court's acknowledgment and the DOC's concession, coupled with the ten-book limitation, indicates why Washington's religious exercise has been substantially burdened. Washington's religion contains two interrelated components–reading four books per

_____

individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." It is unclear which prong the District Court used to decide the case.

18

day about Africa and African people, and then proselytizing about what he has read.  The record amply supports the proposition that Washington cannot practice his religion in the absence of reading these books. Washington is therefore correct in his assertion that "his books and his religion are one and the same; his religion is destroyed in the absence of his religious books."

The ten-book limitation substantially burdens the first component of Washington's religious exercise under the second part of our disjunctive test because it severely inhibits his ability to read four new books per day.  Before the end of three days, Washington would run out of new books.  In response, the Pennsylvania DOC makes two arguments. First, the DOC states that the prison library is available for Washington's use and that he would be permitted to read books that are housed in the library.  The fatal flaw in this argument is that, as we have mentioned, Washington was permitted to visit the library only once a week and could take out just four books at a time.  This policy precludes Washington from reading twenty-eight Afrocentric books per week.  Thus, even if the Pennsylvania DOC is correct that Washington could house his own books in the prison library,[9] this policy would still not permit him to read four books per day.  Second, the Pennsylvania DOC argues that there is no prohibition on Washington's trading those ten books for another ten books at any time.  We find nothing in the record to show that Washington could freely trade books that were located inside the prison.  Similarly, forcing Washington, an indigent prisoner, to have outsiders continuously mail books to him severely inhibits his ability to read four new books per day.

_____

[9]But, as noted, this point is disputed and may have been waived. *See supra* note 3.

Coupling Washington's sincerity of religious belief with the inseparability of the four-book requirement from the exercise of his religion leads us to the conclusion that the Pennsylvania DOC's ten-book limitation substantially burdens the practice of Washington's religion.

## 2. Compelling Governmental Interest

Washington has satisfied his burden to show that the Pennsylvania DOC's ten-book limitation substantially burdens his exercise of religion. 42 U.S.C. § 2000cc-2(b). Accordingly, the burden shifts to the Pennsylvania DOC to show that the policy is in furtherance of a compelling governmental interest and is the least restrictive means of furthering this interest. 42 U.S.C. § 2000cc-1(a).

Interests of safety and health play a particularly important role in the institutional setting. *Williams v. Morton*, 343 F.3d 212, 218 (3d Cir. 2003) (stating that "when a challenged regulation implicates security . . . judicial deference is especially appropriate") (internal quotation omitted); *Lovelace*, 472 F.3d at 210-11 (Wilkinson, J., dissenting) (chastising the majority for not properly accounting for the prison's compelling interest in safety and security). The Supreme Court in *Cutter v. Wilkinson*, 544 U.S. 709 (2005), *repeatedly referenced* the importance of according deference to prison authorities' choices about how to run their institution. The Court plainly stated that "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain *order and safety*." *Cutter*, 544 U.S. at 722 (emphasis added); *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007) (a policy that "is related to maintaining good order and controlling costs" serves a compelling governmental interest). The Court in *Cutter* noted

the importance of order, security, and the granting of deference to prison administrators' expertise, and also displayed "particular sensitivity to security concerns." 544 U.S. at 722-23. Further, "context matters in the application of that standard." *Id.* at 723 (internal quotation omitted). *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 370-72 (6th Cir. 2005); *see also Lovelace*, 472 F.3d at 212 (Wilkinson, J., dissenting) ("As the Supreme Court recognized in *Cutter*, it is simply impossible to divorce a prison's compelling interests in safety and security from internal administration and order."). Even in light of the substantial deference given to prison authorities, the mere assertion of security or health reasons is not, by itself, enough for the Government to satisfy the compelling governmental interest requirement. Rather, the particular policy must further this interest. *See, e.g.*, *Spratt*, 482 F.3d at 39; *Murphy*, 372 F.3d at 988-89; *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 126 S.Ct. 1211, 1225 (2006) (rejecting the government's reliance on a general interest in health and safety in the related RFRA context). A conclusory statement is not enough.

In this case, Washington argues that general assertions of safety and security are not sufficient to establish a compelling governmental interest. He points to the Pennsylvania Administrative Code, which recommends that prisoners should be allowed "a reasonable quantity of reading materials," and that "[n]eatness and good order should be of primary concern rather than a specified number of publications." 37 PA. CODE § 95.245. As further support, Washington points out the arbitrary nature of the ten-book limitation. One DOC policy allows for an exception to the limitation when the books are for educational purposes. Also, an inmate may have ten magazines and three newspapers in addition to the ten books. Similarly, an

21

inmate may have as many non-literature items as will fit in four storage boxes in his cell. If safety and security are the paramount concerns, these exceptions seem to undermine the *compelling* nature of the ten-book limitation.

The Pennsylvania DOC responds that its limitation on the number of books in a cell furthers a compelling governmental interest in protecting the safety and health of prisoners and DOC employees. The District Court agreed with the DOC that the policy furthers the state's compelling governmental interest. The DOC contends that an excess number of books can create a fire hazard, provide a place to conceal weapons or other contraband, and also create a sanitation problem in the relatively small confines of a prison cell.

Certainly, the Pennsylvania DOC has asserted a valid interest, but it fails to make clear how its ten-book limitation furthers this interest. It is unclear how the book limitation decreases the likelihood of a fire in a cell or provides hiding places for contraband when a prisoner in that same cell is permitted to have magazines and newspapers in addition to ten books. We suppose that books eleven through twenty, for example, provide more hiding places than books one through ten. It is also plausible that the physical space taken by these extra books might make a cell dirtier. In this sense, the ten-book limitation might further the Pennsylvania DOC's interest in safety and health. Yet even assuming that the DOC has shown that its ten-book limitation serves a compelling governmental interest, it falls short of satisfying its burden that this DOC policy is the least restrictive means for achieving this interest. *See Warsoldier*, 418 F.3d at 998 (recognizing the comparatively lower threshold to prove a compelling governmental interest when juxtaposed against whether the government policy is the

least restrictive means to achieve that interest); *Lovelace*, 472 F.3d at 191.

### 3. Least Restrictive Means

In other strict scrutiny contexts, the Supreme Court has suggested that the Government must consider and reject other means before it can conclude that the policy chosen is the least restrictive means. *See Warsoldier*, 418 F.3d at 999 (citing *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 824 (2000); *City of Richmond v. J.A. Croson*, 488 U.S. 469, 507 (1989)). In light of the statute's text and legislative history, we agree with the Ninth Circuit in *Warsoldier* that this requirement applies with equal force to RLUIPA. Additionally, the phrase "least restrictive means" is, by definition, a relative term. It necessarily implies a comparison with other means. Because this burden is placed on the Government, it must be the party to make this comparison.

The Pennsylvania DOC argues that the manner in which its policies were applied to Washington were the least restrictive means of furthering the compelling governmental interest in health and safety. To support this point, the DOC emphasizes that the policies were applied to Washington in a flexible manner. The DOC notes that none of Washington's books was ever destroyed, Washington could have donated his books to the prison library so that they would be available to him, and Washington could have exchanged his books for new ones. Because of this flexibility, according to the Pennsylvania DOC, the policy was applied to him in the least restrictive manner possible. There are two interrelated problems with the Pennsylvania DOC's argument. First, this discussion occurred in the District Court against the backdrop of the incorrect

23

assumption that Washington had the burden to prove that there were other less restrictive means available. The District Court noted that "[w]e cannot comprehend, and Washington has not suggested, any way in which the Defendants can better keep inmates' cells safe, other than limiting the amount of personal property inmates may store within their cells." RLUIPA, however, mandates that the Government has the burden to prove that its policy is the least restrictive means. 42 U.S.C. § 2000cc-1(a).

Once we place this burden on the proper party, the second problem arises. This problem is that the ten-book limitation, either facially or as applied to Washington, arbitrarily limits the property an inmate may possess. The record indicates that Pennsylvania DOC policies permit prisoners to have personal property up to a limit of four storage boxes or their equivalent. However, an inmate is not permitted to fill these boxes with more than ten books, although the inmate may fill the boxes with other property. The least restrictive means would be to allow an inmate to choose what property he may keep in the storage units so long as the property does not violate prison policy for an independently legitimate reason. A prisoner could not, for example, keep a knife in the storage unit. Additionally, prison policy permits more than ten books when the books are approved for educational purposes. Finally, inmates are permitted to have ten books, ten magazines, and three newspapers, but not more books instead of fewer magazines and newspapers. Put simply, these two policies evince a flexibility in the prison regulations that belies the "compelling" nature of the policies with respect to safety and security.

There is also flexibility within the Pennsylvania DOC system. Prior to transferring to SCI-Retreat, Washington spent

two decades incarcerated, apparently in the Pennsylvania DOC system. We can find nothing in the record to indicate that prison authorities at these other institutions objected to Washington possessing his books. *See Warsoldier*, 418 F.3d at 1000 ("[T]he failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means."). In sum, even though the ten-book limitation was not strictly applied to Washington, the Pennsylvania DOC has not satisfied its burden to show that the limitation qualified as the least restrictive means to protect its interests in health, safety, and security.

We are satisfied that a ruling in favor of the plaintiff will not lead to judicial micro-management of the Pennsylvania DOC. Here, we are doing no more than examining prison policies on their own terms to determine whether the ten-book limitation is the least restrictive means to achieving a compelling interest in health, safety, and security. The Pennsylvania DOC's own policies state that safety and security of a prison cell are satisfied when the prisoner possesses storage boxes that have the capacity to hold more than ten books. Given the existence of those policies, falling back on safety and security concerns, while possibly satisfying the compelling governmental interest prong of strict scrutiny, will not, independent of other reasoning, also satisfy the least restrictive means test.[10] *See Warsoldier*, 418 F.3d at 998-99 (rejecting the

---

[10]If the books themselves preached violence that undermined safety and security within the prison, then this would be a different case. *See Borzych v. Frank*, 439 F.3d 388 (7th Cir. 2006) (purportedly religious texts advocated white-supremacist violence).

state's "conclusory statements that the [policy in question] is the least restrictive means to ensuring prison security"). We are not facially invalidating the ten-book limitation. We do hold that its application in this case has substantially burdened the exercise of Washington's religious beliefs–the sincerity of which the Pennsylvania DOC does not challenge–and that the DOC has not shown that this burden is the least restrictive means to further its interest in safety and security.

## III.

For the above-stated reasons, we will *reverse* the District Court's Order dismissing Washington's RLUIPA claim and *remand* with instructions to consider whether any factual issues remain when that claim is evaluated under the proper legal standard. On the current record, the DOC has failed to demonstrate that its policy is the least restrictive means to further its interest in safety and security. However, we recognize that the Pennsylvania DOC has not had a full opportunity to rebut Washington's assertions because the District Court appeared to place the least restrictive means burden on Washington rather than the DOC. On remand, the DOC will have the opportunity to do so.