08-2816-pr
Keesh v. Smith

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

———

August Term, 2008

(Submitted: July 7, 2009                          Decided: September 28, 2009)

Docket No. 08-2816-pr

———

JESUS JOVA, TYHEEM KEESH, f/k/a TYHEEM ALLAH,

*Plaintiffs-Appellant*s,

KENNETH ELMORE, AYINDE FAIR, TERRY WILSON,

*Plaintiffs*,

-v.-

JOSEPH T. SMITH, SUPERINTENDENT, SHAWANGUNK CORRECTIONAL FACILITY, EVAN GORELICK, DEPUTY SUPERINTENDENT OF PROGRAMS, SHAWANGUNK CORRECTIONAL FACILITY, GLENN S. GOORD, COMMISSIONER OF DOCS, JOHN H. NUTTALL, MARK LEONARD, GEORGE E. PATAKI, CUTLER, CORRECTION OFFICER, SHAWANGUNK CORRECTIONAL FACILITY, J. BUNCE, CORRECTION OFFICER, SHAWANGUNK CORRECTIONAL FACILITY, JOHN EWANCIW, PLANT SUPERINTENDENT, SHAWANGUNK CORRECTIONAL FACILITY, DONALD SELSKY, DIRECTOR, SPECIAL HOUSING INMATE DISCIPLINARY PROGRAM, A.C. WRIGHT,

*Defendants-Appellee*s.

———

Before: CALABRESI and HALL, *Circuit Judges*, and SESSIONS, *District Judge*,[*]

---

[*] The Honorable William K. Sessions III, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

Appeal from a judgment of the United States District Court for the Northern District of New York (Mordue, *Chief Judge*). AFFIRMED in part and VACATED and REMANDED in part.

Tyheem Y. Keesh and Jesus M. Jova, *pro se*, Wallkill, NY, *for Plaintiffs-Appellants.*

Julie S. Mereson, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Nancy A. Spiegel, Senior Assistant Solicitor General, Martin A. Hotvet, Assistant Solicitor General, of counsel), *for* Andrew M. Cuomo, Attorney General of the State of New York, Albany, NY., *for Defendants-Appellees.*

PER CURIAM:

Plaintiffs-Appellants Tyheem Keesh and Jesus Jova, pro se and incarcerated, appeal a decision of the district court granting the Defendants' motion for summary judgment and dismissing their 42 U.S.C. § 1983 complaint which alleged several constitutional violations in addition to violations of their rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* In this opinion, we address only the RLUIPA claims; the other claims are addressed in a separate summary order filed today. We AFFIRM the judgment below in part and VACATE and REMAND it in part.

Plaintiff Keesh allegedly wrote the Defendants in 2003 requesting that he be able to practice his religion, Tulukeesh. In response, the Defendants advised Keesh that he could practice Tulukeesh in the privacy of his cell, and asked that he speak with the prison chaplain about Tulukeesh and its tenets. Keesh later explained to the chaplain that the dictates of Tulukeesh were set forth in the book, "Holy Blackness," which imposed various dietary

obligations on followers of the religion. Tulukeesh also requires Tulukeesh members to engage in sparring, and prohibits them from appearing nude in front of non-members. Referencing Directive No. 4202, the Defendants informed Keesh that, in order for him to practice his religion in a group setting, he must procure an outside religious clergy person, as well as an inmate facilitator, but that he was free to hold individual services in his own cell. In response, Keesh informed the Defendants that, pursuant to rules set forth in the "Holy Blackness," he was prohibited from practicing his religion absent a congregation, and protested that the Defendants' reliance on Directive No. 4202 deprived him of his right to practice his religion; Keesh then filed a grievance raising this issue. In a decision issued in response to his grievance, the Defendants informed Keesh that he was permitted to practice his religion to the extent allowed under Directive No. 4202; that he should attempt to contact an outside clergy member who could volunteer to administer religions services; and that, with respect to his dietary requirements, he could eat the "religious alternative" meal.[1] Upon Keesh's request, the Defendants also eventually changed Keesh's officially listed religious designation to Tulukeesh. During this same period, Jova also requested to change his religious designation to Tulukeesh, and demanded that the Defendants accommodate his practice of the religion in the same manner as Keesh had sought.

From January to July 2004, Keesh and Jova wrote letters and filed grievances against the Defendants complaining that they continued to be deprived of their right to practice their religion, and arguing that they were being retaliated against for exercising this right. In July 2004, Keesh's and Jova's cells were searched by prison officials, who confiscated copies of

---

[1] The "religious alternative" menu is provided to inmates who require a non-standard meal for religious reasons. It includes non-red-meat- and non-pork-based meals. There is also a Kosher alternative meal known as the "cold alternative" meal.

3

"Holy Blackness" and materials showing that Keesh, seeking to distribute the book, had contacted a self-publishing company. Both Keesh and Jova were then charged with violating institutional rules prohibiting contraband, unauthorized organization, solicitation of goods, and practicing martial acts and engaging in sparring.[2] In their defense, Keesh and Jova asserted their First Amendment rights to free exercise. Both were, however, found guilty of the majority of the charges. In a memorandum explaining the decision, Keesh was told that Directive No. 4202 prohibited proselytizing, and that his actions were tantamount to proselytization.

Keesh and Jova thereafter continued to file grievances alleging violations of their right to practice Tulukeesh and asking that their copies of "Holy Blackness" be returned to them. These grievances were all denied, and, after another search of his cell occurred, Keesh again accused the Defendants of retaliating against him. In January 2005 Keesh was informed that "Holy Blackness" did not violate institutional guidelines set forth in Directive No. 4572, but that he would not be allowed to possess the book. Instead, the book would remain with the prison chaplain and Keesh, Jova, and any other adherent could seek permission to read it. Finally, Plaintiffs explained in their complaint that the tenets of Tulukeesh required that they eat only a complex, highly regimented non-soybean-based vegan diet, and that, because the Defendants had not provided one, they continued to experience health problems.

**I.**

As an initial matter, we must determine whether Appellants received proper notice of the nature and consequences of summary judgment under *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615,

---

[2] As discussed above, the "Holy Blackness" requires that adherents of Tulukeesh receive training in martial arts and sparring.

620-21 (2d Cir. 1999).  The failure to give actual notice to a pro se litigant of the consequences of not responding adequately to a summary judgment motion will usually constitute grounds for vacatur.  *See Sawyer v. Am. Fed'n of Gov't Employees*, 180 F.3d 31, 34-35 (2d Cir. 1999) (collecting cases).  Where, however, a pro se litigant has demonstrated a clear understanding of the nature and consequences of a summary judgment motion and "the need to set forth all available evidence demonstrating a genuine dispute over material facts," failure to provide proper notice will be deemed harmless.  *See M.B. # 11072-054 v. Reish*, 119 F.3d 230, 232 (2d Cir. 1997) (finding that a pro se litigant who filed a 27-page declaration of facts with 104 pages of exhibits, a 40-page memorandum of law, and a cross-motion for summary judgment understood the nature and consequences of summary judgment).

Here, there is no indication that Defendants or the district court gave Plaintiffs a proper *Vital* notice.  Nevertheless, we conclude that the absence of notice was harmless, as the record indicates that Plaintiffs were fully aware of the requirements of summary judgment.  They filed a cross-motion for summary judgment, submitted over 300 pages in opposition to the Defendants' motion, and, in their statement of undisputed material facts, attempted thoroughly to dispute the statement of material facts submitted by the Defendants.  Taking into account "the nature of the papers submitted by the litigant and the assertions made therein as well as the litigant's participation in proceedings before the District Court," *Vital*, 168 F.3d at 621, we, therefore, find that the Plaintiffs knew that they were required to present evidence supporting their factual allegations (and, in fact, did so), and that the lack of *Vital* notice was harmless, *see M.B. # 11072-054*, 119 F.3d at 232.

**II.**

5

We review orders granting summary judgment *de novo* and focus on whether the district court properly concluded that there was no genuine issue as to any material fact and the moving party was entitled to judgment as a matter of law. *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Republic Nat'l Bank v. Delta Airlines*, 263 F.3d 42, 46 (2d Cir. 2001); *Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir. 1999). In determining whether there are genuine issues of material fact, we are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (internal quotation marks omitted).

As a general matter, the RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment. *See Cutter v. Wilkinson*, 544 U.S. 709, 714-16 (2005). "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (quoting RLUIPA, 42 U.S.C. § 2000cc-1(a)). Where a plaintiff adduces evidence sufficient to show that the government practice substantially burdens her religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest. *See* 42 U.S.C. § 2000cc-2(b).

Here, because the Defendants do not dispute that the Appellants are engaged in "religious exercise," and because both parties also assume that the challenged actions constitute a substantial burden on that exercise, we need only consider whether the Defendants' restrictions serve a compelling state interest and are the least restrictive means of furthering that interest.

6

**III.**

We have not previously considered what constitutes a compelling state interest under the RLUIPA. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007) (holding only that "compelling state interests" are "interests of the highest order." (internal quotation marks omitted)). Nonetheless, the Supreme Court has observed that safety and security concerns "are undisputedly compelling state interests," and that, in enacting the RLUIPA, Congress "anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 717, 723 (internal quotation marks omitted). Thus, the Supreme Court did not "read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.* at 722.

Other circuits have, however, recognized that the state may not merely reference an interest in security or institutional order in order to justify its actions; rather, "the particular policy must further this interest," *Washington v. Klem*, 497 F.3d 272, 283 (3rd Cir. 2007); and must be more than conclusory, *see Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988-89 (8th Cir. 2004). Where a circuit court has found that a state's identified interest was insufficiently compelling, this was often based on the court's observation that the state failed to provide sufficient evidence explaining how the practices at issue furthered the stated interest. *See Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 38-41 (1st Cir. 2007) (prison security not "compelling interest" where prison officials offered no evidence that a blanket prohibition on inmate preaching represented a threat to institutional safety); *Lovelace v. Lee*, 472 F.3d 174, 190-91 (4th

7

Cir. 2006) (safety and security considerations are not "compelling interests" because neither was asserted by prison officials as a motivating factor in the enactment of the challenged practices). Accordingly, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the [RLUIPA's] requirements." 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA).

Based on these principles, we conclude that the district court properly found that the Defendants' interests were compelling. For, unlike the officials in the above listed cases, the Defendants here have submitted voluminous affidavits and exhibits which showed that the restrictions imposed on Plaintiffs' practice of Tulukeesh were justified by powerful security and administrative interests.

**IV.**

We have also not previously considered under what circumstances a challenged practice constitutes the least restrictive means of furthering a state's compelling interests. Other circuits that have addressed this question have required that, for a state to demonstrate that its practice is the least restrictive means, it must show that it "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005); *accord Washington*, 497 F.3d at 284; *cf. United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 824 (2000) (finding, in First Amendment challenge to speech restrictions, that "[a] court should not assume a plausible, less restrictive alternative would be ineffective"); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989) (holding, in part because city did not consider whether race-neutral measures would have achieved government's

8

interest, that city minority set-aside not narrowly tailored).  Moreover, other circuits have observed that "the failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means." *Warsoldier*, 418 F.3d at 1000 (cited approvingly in *Washington*, 497 F.3d at 285).

Consideration of these principles leads us to conclude that the majority of the Defendants' practices satisfy the "least restrictive means" standard.  As the district court observed, Directive 4202 strikes a delicate balance between respecting inmates' demands to participate in congregational activities, while ensuring that those meetings do not serve as proxies for gang recruitment or organization.  To this end, the Directive permits inmates who lack a prison-affiliated chaplain to seek an outside sponsor to direct congregational meetings, and, where such a chaplain is not available, allows an inmate to serve as a facilitator for the meetings, but only if the religion is known outside the institution.  This structure evidences the Directive's careful consideration of possible alternatives to a prohibition on non-chaplain-run congregational meetings, and demonstrates that limiting Appellants' practice of Tulukeesh to their individual cells is the least restrictive means of achieving these interests.  Because Appellants failed to obtain outside sponsorship, any other type of group meeting would contradict Directive 4202 and the compelling interests it serves.

For similar reasons, the Defendants' prohibition on Appellants' demand to spar and receive professional martial arts training is the least restrictive means of furthering the Defendants' compelling interests of safety and institutional security.  Even in the absence of explicit DOCS regulations barring such activities, the obvious security implications of allowing

9

inmates to practice potentially violent physical activities render the prohibition of such activities the least restrictive means of ensuring institutional safety. This same rationale supports the Defendants' refusal to respect the Appellants' demand that they not appear nude before non-Tulukeesh adherents, since institutional concerns mandate strip frisks on appropriate occasions. Moreover, Appellants' demonstrated failure to adhere to institutional prohibitions against proselytization shows that the current restriction on the public use of Holy Blackness satisfies the "least restrictive" requirements of RLUIPA. (Appellants are still allowed access to the book for religious purposes by submitting a request to the prison Chaplain.)

Plaintiffs' dietary demands present a more complex issue. As an initial matter, the record reveals that Plaintiffs' dietary requests are highly detailed, and, to the extent Plaintiffs require specific foods (and portions thereof) on individual days of the week, and that such foods be prepared by Tulukeesh adherents, the district court correctly found that the administrative burden of providing such individualized meals justified the Defendants' refusal to comply with Plaintiffs' demands. There was no less restrictive alternative to these specific requests.

The record also indicates that the Plaintiffs' religion mandated a vegan diet that did not include soybeans or soy-related products with the exception of soy milk. The district court concluded that the Defendants had provided the least restrictive alternative by offering the Plaintiffs the religious/meatless alternative entree at lunch and dinner and allowing them to supplement their diet with commissary purchases.

It is unclear to us whether the district court considered whether the Defendants were capable of offering a vegetarian diet to Plaintiffs as the least restrictive means of furthering their administrative and security interests. The record shows that, during the course of a regular week,

10

the religious/meatless alternative menu offered fish entrees two or three times a week for lunch or dinner. Eggs, cheese, beans, meat substitutes and assorted vegetables made up the balance of the week's alternative menu entrees. Although the record indicates that the Defendants were perfectly capable of providing a vegetarian entree on most days of the week, and may in fact have provided vegan entrees on occasion, there is no indication that the Defendants discussed, let alone demonstrated, why they cannot provide an entirely vegetarian menu to inmates who request it. We therefore conclude that the Defendants did not demonstrate that the religious/meatless alternative menu was the least restrictive means of furthering their compelling administrative interests.

Because the record fails to show that the religious alternative menu provided to the Appellants is the least restrictive means of furthering the Defendants' compelling interests, the district court's grant of summary judgment to the Defendants as to this issue was incorrect. Accordingly, the case is remanded for consideration of whether there is a less restrictive substitute (including, but not limited to, an entirely vegetarian diet) for the current religious alternative menu.[3]

The portion of the district court's judgment granting the Defendants' motion for summary judgment as to the Appellants' RLUIPA claim concerning the restrictions on their dietary

---

[3] In support of its decision granting summary judgment to the Defendants as to this issue, the district court appeared to reject the possibility that Defendants could offer a less restrictive alternative to the religious menu. It focused on the fact that Appellants "simply do not wish to accept *any alternatives* that defendants propose . . . [and that] it is either *all or nothing* with respect to their religion." Although this observation is supported by some statements by Appellant Keesh, which indicated various bright-line rules concerning the proper Tulukeesh diet, the record also indicates that there are other foods, not listed in Holy Blackness, that Tulukeesh adherents can eat. This suggests a degree of flexibility in Tulukeesh dietary rules that could result in a potential compromise as a result of further accommodation by the Defendants.

practices is hereby **VACATED** and the matter is **REMANDED** to the district court for further proceedings consistent with this order.[4]  The remainder of the district court's judgment is **AFFIRMED**.

---

[4] The Defendants raised the issue of qualified immunity below, but the District Court did not address it.  We leave it to the District Court to consider this question in the first instance.